**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Richard J. ADAMSON, Defendant–Appellant.**

**No. 00–10643.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 15, 2002.

Filed May 23, 2002.

Marcus S. Topel, Daniel F. Cook, Joseph D. Elford, Topel & Goodman, San Francisco, CA, for the defendant-appellant.

Thomas E. Flynn, Assistant U.S. Attorney, Sacramento, CA, for the plaintiff-appellee.

Before GOODWIN and TROTT, Circuit Judges, EZRA,* District Judge.

## OPINION

GOODWIN, Circuit Judge.

Richard J. Adamson was convicted of wire fraud and money laundering in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 1956(a)(1)(A)(i). He appeals, contending, *inter alia*, that the district court erred by (1) restricting his cross-examination of a key government witness and (2) broadening the scope of the indictment. For the reasons that follow, we reverse.

## BACKGROUND

### 1. The Business Plan

From 1992 through 1999, Richard Adamson and his brother John (collectively "the Adamsons") owned and operated "Hardwarehouse," a Dallas, Texas company, which sold used computer equipment, including computer servers.[1] In 1995, Hardwarehouse began purchasing used Hewlett–Packard ("HP") 3000 and 9000 series servers from Deborah Balon, the head of HP's Finance and Remarketing Division ("FRD"). Balon sold used HP servers to Hardwarehouse through a bidding process in which Hardwarehouse was

---

* The Honorable David A. Ezra, United States District Judge for the District of Hawaii, sitting by designation.

1. A server can run hundreds of different tasks and accommodate many users at once, unlike a personal computer which typically is capable of performing only one or two tasks at a time.

the only bidder. During the course of their business relationship, the Adamsons provided Balon and her fiancé, Marc Loriau, with numerous personal gifts including cash, international vacations, and luxury items. At trial, the government offered testimony tending to show that the Adamsons were bribing Balon in order to get her to sell the used servers to Hardwarehouse. The defense, on the other hand, offered testimony tending to show that Balon was extorting the Adamsons by offering to sell Hardwarehouse used HP servers only so long as the Adamsons continued to provide her with personal gifts.

The servers that Adamson purchased from FRD could be upgraded, and thereby made more valuable, through the use of an HP software utility called "SS—Config." In order to prevent unauthorized upgrades of its servers, HP made SS—Config available only to HP custom engineers and each copy was protected with a secret password. HP had not authorized the Adamsons to make use of or have access to SS—Config. Nevertheless, Richard Adamson was able to obtain a password-disabled copy of SS—Config from Derek Eisenbeis, the owner of a company called Diablo Equipment Technology.

In November 1998, FBI agents serving a search warrant at Hardwarehouse discovered two password-disabled copies of SS—Config. Several weeks after the search, the Adamsons, accompanied by their lawyer, submitted to a tape-recorded interview with two HP investigators. During the course of the interview, Richard asserted that the brothers had legitimately used SS—Config to upgrade HP servers. Richard explained that the warehouse responsible for delivering the HP equipment to Hardwarehouse would sometimes send out "bezels" (the term "bezel" describes the back plate of a server where the series and model number of the server are em-

bossed) with higher capabilities than the processors in the servers. According to Richard, he and his brother used SS—Config only to remedy this disparity (i.e., by upgrading the servers to match the information on the bezels). Richard also told the HP investigators that Balon and Loriau had coerced Richard and John into making payments. For the most part, John was silent during Richard's explication, although occasionally John would affirm what Richard said by stating "exactly" or something similar.

At some point after the HP interview, the brothers had a falling out. In February 1999, Richard "locked-out" John by hiring security guards to prevent John's entry into the Hardwarehouse facility. John testified at trial that the brothers had not spoken since the day of the lock-out.

Several weeks after the lock-out, John entered into a plea agreement with the government. John told the government that he and his brother had bribed Deborah Balon. He also agreed, in expectation of a reduced sentence, to help the government in its investigation and prosecution of Richard.

### 2. The Indictment and the Proof

On February 25, 2000, a grand jury returned a second superseding indictment charging Richard with the following: twenty-three counts of wire fraud, based on Hardwarehouse's payments to Balon and Loriau; eight counts of wire fraud, based on obtaining a proprietary HP software program, using it to upgrade HP computer equipment, and then tricking HP into transferring licenses for the upgraded equipment; and one count of money laundering.

The wire fraud charges alleged that the defendant had made a particular misrepresentation to HP in the commission of wire fraud, namely: "defendant ADAMSON

and others tricked HP into transferring software licenses on these upgraded servers by *falsely representing to HP that they had really not been modified or upgraded at all.*" (emphasis added). During a hearing on a motion for a bill of particulars, defense counsel asked whether this was the only misrepresentation alleged by the government.[2] The government responded that no other type of misrepresentation was at issue.

At trial, however, the government's evidence proved a misrepresentation different from that specified in the indictment and discussed at the pretrial hearing. After purchasing used HP servers from Balon, the defendant utilized a password-disabled copy of SS—Config to upgrade the servers. In order to sell these upgraded servers to Hardwarehouse customers, the defendant needed to find a way to get HP to issue user licenses that would reflect the upgrades performed by Hardwarehouse. The HP-issued licenses needed to reflect the upgrades performed by Hardwarehouse so that, when HP technicians performed maintenance on the servers, they would not notice any inconsistencies between the servers' capabilities and the servers' licenses.

To solve this potential problem, Balon drew up a form memorandum, known in HP parlance as a "license transfer request" ["LTR"], for transferring ownership rights in the upgraded servers to Hardwarehouse. Hardwarehouse would send Balon the upgraded server specifications that it wanted her to include in the LTR. Balon would include the upgraded server specifications in the LTR, and she would then send copies of the LTR to both Hardwarehouse and HP headquarters. After Hardwarehouse received the LTR from Balon, it proceeded to send it to a sales contract administrator at HP ("HP administrator") who would then issue the purchaser of the server a transfer authorization letter which officially approved the upgraded license and the transfer of the license to the Hardwarehouse customer purchasing the server.

Significantly, the LTRs sent by Hardwarehouse to the HP administrator contained HP model numbers that *did* in fact reflect the upgrades that had been performed by Hardwarehouse. In other words, the defendant did not misrepresent *the fact that* the servers had been upgraded. Rather, the evidence tended to show that Hardwarehouse had misrepresented *how* the servers had been upgraded (*i.e.,*

2. The colloquy between the magistrate judge, defense counsel (Mr. Topel) and the government (Mr. Sonderby) went as follows:

Mr. Topel: Well, my—let me just—I know it's getting long, but I'll just take a second. I want to explain what our problem was, and I thought we solved it outside the court.

There is an allegation that the defendant made misrepresentations.

The Government has advised me that those misrepresentations ... in this case were the requests for the license, and in the indictment, that is where supposedly the trick of those requests is, that he's not telling them whether or not they were upgraded or downgraded or whatever.

And I understood that's what we're dealing with in this case, that's what we're defending against, and all I'm asking is that either that be directed by the Court or you confirm that.

The Court: Mr. Sonderby?

Mr. Sonderby: Well, I think I did in fact tell Mr. Topel that those mis representations are contained in the faxes and the correspondence between those entities and they're also contained in other statements, as he acknowledged.

The Court: Right. What he's looking for, is there any other type of misrepresentation—

Mr. Sonderby: No, your Honor.

The Court:—aside from what's involved in the license transfer?

Mr. Sonderby: No.

The Court: The answer is no. All right, so we're safe there.

with an unauthorized password-disabled copy of SS—Config). Had the HP administrator known that the defendant and his cohorts had upgraded the servers with an unauthorized copy of SS—Config, the administrator would not have provided the defendant with upgraded user licenses.

This divergence between the misrepresentation alleged in the indictment and the misrepresentation proved at trial was reinforced by the district court's wire fraud instruction, which stated:

> Defendant is charged in Counts 24 through 31 of the indictment with wire fraud in violation of Section 1343 of Title 18 of the United States Code. In order for defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

> First, defendant made up a scheme or plan for obtaining money or property by making false promises or statements, *with all of you agreeing on at least one promise or statement that was made;*

> Second, defendant knew that the promise or statements were false;

> Third, the promises or statements were of a kind that would reasonably influence a person to part with money or property;

> Fourth, defendant acted with the intent to defraud; and

> Fifth, defendant used, or cause to be used, the wires to carry out an essential part of the scheme.

Thus, the district court's instruction did not specify the particular misrepresentation set forth in the indictment.

### 3. Cross-examination of John Adamson

In accordance with the plea agreement, John testified on behalf of the government at Richard's trial, asserting that he and Richard had fabricated the explanations that they had set forth at the HP interview, i.e., that Hardwarehouse used SS—Config only to match processors to bezels and that the payments to Balon and Loriau were coerced.

On cross-examination, the defense sought to impeach John by establishing that John had implicitly adopted the statements made by Richard during the HP interview and that Richard's statements at the HP interview were inconsistent with John's trial testimony. Defense counsel began by asking John whether he was present at the HP interview when Richard stated that Balon and Loriau had demanded payments. The government objected to the question on hearsay grounds, and the district court sustained the objection. Defense counsel proceeded to ask John some additional questions relating to John's implicit adoption of Richard's statements at the HP interview, and the district court again sustained the government's hearsay objections.

When defense counsel continued to pursue the same line of questioning, the district court ordered both government and defense counsel to approach the bench. Defense counsel argued that John had, through his behavior at the HP interview, implicitly adopted the statements made by Richard. The defense further argued that, in order to impeach John, the defense needed to introduce Richard's statements in order for the jury to understand John's monosyllabic agreement with those statements. In this context, the jury would understand that John's trial testimony was inconsistent with the impression that he made at the HP interview. The district court ruled that Richard could impeach John only with statements that John himself had made during the HP interview, but excluded Richard's statements under Federal Rule of Evidence 403.

## DISCUSSION

### 1. Jurisdiction and Standards of Review

Richard filed a timely notice of appeal, and we have jurisdiction pursuant to 28 U.S.C. § 1291. Although Richard raises numerous issues on appeal, we discuss only those contentions that we find to have merit.

■■ We review for an abuse of discretion the district court's decision to exclude evidence under Rule 403. *United States v. Martinez,* 182 F.3d 1107, 1110 (9th Cir. 1999). Similarly, we review for an abuse of discretion the district court's decision to exclude evidence as hearsay. *United States v. Ortega,* 203 F.3d 675, 682 (9th Cir.2000). We review de novo whether limitations on cross-examination are so severe as to violate the Confrontation Clause. *Id.* We also review de novo Richard's contention that the district court constructively amended the indictment. *United States v. Pisello,* 877 F.2d 762, 764 (9th Cir.1989).

### 2. Limitations on cross-examination

■ Richard contends that the district court, through a series of erroneous evidentiary rulings, violated his constitutional right of confrontation by prohibiting him from attacking his brother's credibility. Because the trial court's rulings unnecessarily limited relevant, probative, and perhaps crucial evidence concerning the credibility of a key government witness, we agree.

■■ The Confrontation Clause of the Sixth Amendment secures a defendant's right to cross-examine government witnesses. *See Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *Evans v. Lewis,* 855 F.2d 631, 633–34 (9th Cir.1988). Although the Confrontation Clause "does not guarantee unbounded scope in cross-examination," *United States v. Lo,* 231 F.3d 471, 482 (9th Cir.2000), it does guarantee "an *opportunity* for effective cross-examination." *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (quoting *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985)) Central to the Confrontation Clause is the right of a defendant to examine a witness's credibility. *See Davis,* 415 U.S. at 316, 94 S.Ct. 1105; *see also Boggs v. Collins,* 226 F.3d 728, 736 (6th Cir.2000) ("At the core of the Confrontation Clause is the right of every defendant to test the credibility of witnesses through cross-examination."). When exploring the credibility of a government witness who testifies against a criminal defendant at trial, it is axiomatic that the defendant may employ the witness's prior inconsistent statements in order to impeach the credibility of the witness. *See United States v. Hale,* 422 U.S. 171, 176, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975); *United States v. Bao,* 189 F.3d 860, 865–66 (9th Cir.1999); *United States v. Monroe,* 943 F.2d 1007, 1012 (9th Cir.1991); *United States v. McLaughlin,* 663 F.2d 949, 952 (9th Cir.1981). "A prior inconsistent statement is admissible to raise the suggestion that if a witness makes inconsistent statements, then his entire testimony may not be credible." *Bao,* 189 F.3d at 866.

■ Similarly, witnesses may be impeached "by their previous failure to state a fact in circumstances in which that fact naturally would have been asserted." *Jenkins v. Anderson,* 447 U.S. 231, 239, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980); *see also United States v. Sheffield,* 992 F.2d 1164, 1168–69 (11th Cir.1993); *United States v. Leach,* 613 F.2d 1295, 1305 (5th Cir.1980).

Here, Richard and John arranged an interview with HP in order to provide the brothers with an opportunity *jointly* to disclose their knowledge to HP. The joint

character of the interview evinces that John's silence in the face of Richard's statements, especially those statements relating directly to the alleged misconduct of Richard and John, amounted to an implicit adoption of Richard's statements. If Richard had asserted facts about the brothers' conduct that John did not want to be attributed to him, it would have been natural for John to speak up and voice his disagreement. John did not, however, express disagreement with his brother.

After entering into a plea agreement with the government, John testified that he and Richard had fabricated the explanations that they had set forth at the HP interview. John's in-court testimony was therefore inconsistent with his prior silence at the HP interview. This inconsistency cuts to the heart of John's credibility: not only does John's prior silence cast doubt on the reliability of his in-court testimony, but it also raises questions regarding John's motivation to testify. *See Sheffield*, 992 F.2d at 1168 (observing that, where specter of disciplinary action and criminal prosecution hung over witness's head until he told officials that defendant was responsible for alleged criminal conduct, evidence of witness's prior failure to implicate defendant raised the possibility that witness testified against defendant solely to protect himself).

Reluctant to acknowledge the credibility problems raised by John's prior silence, the government contends that the district court's ruling was not in error. The government makes much of the fact that, although the court's ruling prohibited the introduction of statements made by Richard at the HP interview, the ruling allowed defense counsel to introduce statements made by John at the HP interview. According to the government, John's statements provided sufficient ammunition for the defense to attack John's credibility, thereby expunging any need on the part of the defense to introduce into evidence Richard's statements and John's accompanying silence.

As an example, the government notes that during the HP interview Richard described the details of Balon's demands for money. After Richard completed his description, John volunteered "that's true." The government suggests that defense counsel could have introduced "that's true" for impeachment purposes without introducing the statement to which "that's true" referred.

The government's argument misses the mark. A statement like "that's true" is meaningless to a jury, at least for the purpose of assessing credibility, without its referent. The defense needed to be able to introduce Richard's statements in order to place John's statements in context and thereby make a statement like "that's true" meaningful to a finder of fact. By limiting the scope of the defense's cross-examination, the district court effectively precluded Richard from attacking John's credibility and denied the jury access to the information it needed in order to appraise John's biases and motivations. That was error.[3] *See Lo*, 231 F.3d at 482 (stating that court of appeals will find a Confrontation Clause violation where trial court's ruling "limit[ed] relevant testimony, prejudice[d] the defendant, and denie[d] the jury sufficient information to appraise the biases and motivations of the witness"); *United States v. Harris*, 185 F.3d 999, 1008 (9th Cir.1999) (stating that

---

**3.** We further note that Richard's statements were not properly excluded as hearsay because they were not being offered for their truth value. Fed.R.Evid. 801(c). Nor were Richard's statements appropriately excluded under Rule 403: the statements were exceedingly probative and only minimally, if at all, prejudicial. Fed.R.Evid. 403.

although "the district court can exercise discretion to avoid undue consumption of time and confusion of issues in the cross examination, these legitimate concerns cannot justify so severe a limitation as to prevent the jury from finding out what it needs in order to judge rationally whether the witnesses might be lying or shading the truth").

■ The question remains as to whether the error was harmless. *See Harris*, 185 F.3d at 1008 ("Where the limitation on cross examination is so complete as to amount to a denial of the constitutional right of confrontation, the question on appeal is whether the error was harmless beyond a reasonable doubt."). The government observes that the subject of most of the challenged statements was the defendant's claim that Balon had been extorting him. Relying on this observation, the government contends that any error resulting from the district court's rulings was harmless because the jury was unable to reach a verdict on the bribery counts.

The government again misunderstands the significance of the credibility contest at issue. Because John's testimony regarding the HP interview squarely contradicted his brother's defense, it followed that at least one of the brothers was lying. In other words, if the jury believed John's testimony, it would necessarily have to disbelieve at least a portion of Richard's defense. Further, when the government introduced John's testimony, asserting that Richard was lying about a portion of his defense, the government gave the jury a reason to believe that Richard was lying about the entirety of his defense. Thus, Richard's inability to attack his brother's credibility could have been the defense's fatal flaw. Of course, it was possible that John was lying and Richard was being truthful. Through its rulings, however, the district court precluded Richard from

making this case. Consequently, the defendant was prejudiced, and the error was not harmless.

### 3. Constructive amendment of the indictment

Richard next contends that the district court's jury instruction on wire fraud impermissibly broadened the scope of the indictment so as to allow the jury to convict him on the basis of conduct other than that specified by the grand jury. Again, we agree.

■ The Fifth Amendment guarantees a criminal defendant "[the] right to stand trial only on charges made by a grand jury in its indictment." *United States v. Garcia–Paz*, 282 F.3d 1212, 1215 (9th Cir.2002). After an indictment has been returned and criminal proceedings are underway, the indictment's charges may not be broadened by amendment, either literal or constructive, except by the grand jury itself. *See Stirone v. United States*, 361 U.S. 212, 215–16, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960); *United States v. Pazsint*, 703 F.2d 420, 423 (9th Cir.1983).

■ "An amendment of the indictment occurs when the charging terms of the indictment are altered, either literally or in effect, by the prosecutor or a court after the grand jury has last passed upon them." *United States v. Von Stoll*, 726 F.2d 584, 586 (9th Cir.1984); *see also United States v. Dipentino*, 242 F.3d 1090, 1094 (9th Cir.2001) ("A constructive amendment 'involves a change, whether literal or in effect, in the terms of the indictment.' ") (quoting *Jones v. Smith*, 231 F.3d 1227, 1232 (9th Cir.2000)). A variance, on the other hand, "occurs when ... the evidence offered at trial proves facts materially different from those alleged in the indictment." *Von Stoll*, 726 F.2d at 586 (quot-

ing *United States v. Cusmano,* 659 F.2d 714, 718 (6th Cir.1981)).

■ The line between a constructive amendment and a variance is at times difficult to draw. *See, e.g.,* 3 Charles Alan Wright, Federal Practice and Procedure, Criminal § 516 (2d ed.1982) (observing that "[a] rather shadowy distinction has been drawn between amendment and variance"); *United States v. Antonakeas,* 255 F.3d 714, 722 (9th Cir.2001) (observing that "[t]he distinction between an amendment to an indictment and a variance is blurred"). Nevertheless, the line is significant because, whereas a constructive amendment always requires reversal, "a variance requires reversal only if it prejudices a defendant's substantial rights." *United States v. Olson,* 925 F.2d 1170, 1175 (9th Cir.1991).

In our efforts to draw this line, we have found constructive amendment of an indictment where (1) "there is a complex of facts [presented at trial] distinctly different from those set forth in the charging instrument," or (2) "the crime charged [in the indictment] was substantially altered at trial, so that it was impossible to know whether the grand jury would have indicted for the crime actually proved." *Von Stoll,* 726 F.2d at 586; *see also Dipentino,* 242 F.3d at 1094–95 (finding constructive amendment where indictment charged defendants with allowing scraped asbestos-containing materials to dry out on floor, instead of placing materials, while wet, into leak proof containers, but jury instruction permitted jury to convict defendants for failing to deposit asbestos containing materials as soon as possible at waste disposal site meeting appropriate federal requirements); *United States v. Carlson,* 616 F.2d 446, 447–48 (9th Cir.1980) (finding constructive amendment where indictment charged defendant with misapplying bank funds by causing loan to be made for personal use, but evidence and instructions permitted conviction for misapplying bank funds by causing loan to be made knowing that it was inadequately secured); *Howard v. Dagget,* 526 F.2d 1388 (9th Cir.1975) (finding constructive amendment where indictment charged defendant with inducing two named women to engage in prostitution but evidence and instructions allowed jury to convict defendant of inducing women neither named nor mentioned in indictment).

Although a constructive amendment usually involves a complex of facts, we have generally found a variance where the indictment and the proof involve only a single, though materially different, set of facts. *See Von Stoll,* 726 F.2d at 586 (finding nonfatal variance where indictment charged defendant with "transporting in interstate commerce $10,000 that was taken by fraud from Ron McCallum" but proof and instructions allowed jury to convict defendant of taking $10,000 from McCallum's business partner); *United States v. Tsinhnahijinnie,* 112 F.3d 988, 990–92 (9th Cir.1997) (finding fatal variance where indictment charged defendant with sexual abuse of child occurring on Indian reservation during summer of 1992, but proof fluctuated between placing the abuse at place and time in indictment and placing it off reservation in 1994); *Olson,* 925 F.2d at 1174–75 (finding nonfatal variance, in mail fraud prosecution, where indictment charged "a scheme to defraud and to obtain money" but jury instructions required proof that defendants schemed to defraud by obtaining "money or property"); *Jeffers v. United States,* 392 F.2d 749, 752–53 (9th Cir.1968) (finding fatal variance where indictment alleged that money solicited by religious group was used for non-religious purposes, but evidence failed to prove that use was non-religious, instead showing that use was merely contrary to representations made when money was collected).

■ Here, there was clearly a divergence between the misrepresentation spec-

ified in the indictment and the misrepresentation shown at trial. Although the indictment charged the defendant with misrepresenting the fact that the servers had been upgraded, the court's instructions allowed the jury to convict the defendant of wire fraud if it found that the defendant had misrepresented how the servers had been upgraded. The government concedes the existence of this divergence but maintains that it constitutes, at most, a nonfatal variance.

We agree that the divergence at issue amounts to a variance rather than a constructive amendment. We reach this conclusion because, "[h]ere, there is but one set of facts with a single divergence," namely, the content of the misrepresentation that the defendant made to HP. *Von Stoll,* 726 F.2d at 586. There is not a complex of facts as there generally is where we have found a constructive amendment.

Additionally, the divergence between the misrepresentation charged in the indictment and that shown at trial did not alter the crime charged "so that it was impossible to know whether the grand jury would have indicted for the crime actually proved." *Id.* Although the discrepancy between the indictment and the proof was perhaps crucial to the defendant's case, the particular misrepresentation proved at trial supported the same crime, *i.e.*, wire fraud, with which the grand jury had charged the defendant.

We reject, however, the government's contention that the variance was nonfatal. Here, the variance was fatal because it affected the substantial rights of the defendant. *See id.* at 587 ("A variance between indictment and proof does not require reversal unless it affects the substantial rights of the parties.") (quoting *United States v. Kaiser,* 660 F.2d 724, 730 (9th Cir.1981)).

■ One of the primary purposes of an indictment is to inform a defendant of "what he is accused of doing in violation of the criminal law, so that he can prepare his defense." *Tsinhnahijinnie,* 112 F.3d at 991 (9th Cir.1997); *see also Olson,* 925 F.2d at 1175 (observing that requirement that proof remain true to indictment "serves notice related-functions of protecting against unfair surprise, enabling the defendant to prepare for trial and permitting the defendant to plead the indictment as a bar to later prosecutions"). This purpose was not served here. If the indictment had not specified a different particular misrepresentation, one might say the variance was benign. Having specified a different particular misrepresentation, however, the indictment not only failed to inform the defendant of the actual misrepresentation that would be shown at trial, but it also affirmatively misled the defendant and obstructed his defense at trial.

Further, the government's representation at the pretrial hearing, asserting that the misrepresentation in the indictment was the only misrepresentation at issue, served to provide the defendant with an additional reason to detrimentally rely on the indictment. The indictment and the government's representation induced the defendant to prepare a defense that would be insufficient to ward off the government's proof at trial. The district court implicitly condoned these wrongs by instructing the jury in such a way as to allow the defendant to be convicted on the basis of conduct other than that with which he was charged. This constitutes reversible error.

In accordance with the foregoing, we reverse Richard Adamson's conviction and remand for a new trial.

REVERSED and REMANDED.