**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

TOMMY OWEN HARTZ,
*Defendant-Appellant.*

No. 05-30134

D.C. No.
CR-02-00157-001-
TSZ

OPINION

Appeal from the United States District Court
for the Western District of Washington
Thomas S. Zilly, District Judge, Presiding

Submitted March 9, 2006*
Seattle, Washington

Filed August 17, 2006

Before: Diarmuid F. O'Scannlain, Barry G. Silverman, and
Ronald M. Gould, Circuit Judges.

Opinion by Judge Gould

---

*This panel unanimously finds this case suitable for decision without
oral argument. *See* Fed. R. App. P. 34(a)(2).

9759

**COUNSEL**

David B. Zuckerman, Seattle, Washington, for the defendant-appellant.

Susan M. Roe, Assistant U.S. Attorney, Seattle, Washington, for plaintiff-appellee United States of America.

---

**OPINION**

GOULD, Circuit Judge:

After a jury trial, Tommy Hartz was convicted of conspiracy, interference with commerce by robbery, use of a firearm during and in relation to a crime of violence, and being a felon in possession of a firearm. Hartz appeals his conviction, arguing: (1) that the district court admitted evidence obtained during an unlawful police search in violation of the Fourth Amendment; (2) that the jury instructions constructively amended the indictment in violation of the Fifth Amendment; and (3) that the evidence offered at trial was insufficient to warrant the jury's verdict. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

**I**

On the morning of July 21, 2000, two men robbed Gem Design, a jewelry store in Bellevue, Washington. There were then no customers in the store and only one employee, Richard Marciel. Before the robbery, Marciel had been in the back of the store[1] doing appraisal work. Hearing someone enter the store, Marciel walked towards the front of the store. As Marciel reached the showroom, he saw a man pointing a gun at him, about ten feet to his left. Another man, who appeared to be unarmed, was standing near the front of the store. Both

---

[1]The store was divided into two parts: a showroom in the front, where the store displayed its merchandise, and a backroom, comprised of storage and workspace, where the store's employees repaired and cleaned jewelry. The two parts of the store were separated by a wall. A door led from the backroom to the showroom, and windows allowed a person in the backroom to see into the showroom.

men were wearing hats and tee shirts. The hats were pulled down to the robbers' eyebrows. The tee shirts were pulled up to cover their mouths. Marciel would later testify that the robbers' clothing was "bulky," and that the robbers wore "layers of clothing," which Marciel considered odd because the robbery occurred on a mid-summer day. Marciel noticed that the gun pointed at him was silver and had a longer barrel than the .38-caliber gun he owned. The gunman told Marciel to lay face down in the doorway if he valued his life, demanded to know where the store kept its gold and diamonds, and, at some point, called to the front of the store, "Joe, how are you doing?" When the robbers had most of the store's jewelry and cash, the gunman told Marciel to stand up and walk to the back of the store. As the gunman looked around for something to which he could handcuff Marciel, Marciel saw the side of the gunman's face, and noted its texture and tone. The gunman handcuffed Marciel to a piece of jewelry-cleaning equipment, told him to stay still for five minutes, and then left the store. The robbers stole most of the store's inventory of gold and precious stones, worth more than $200,000.

The day after the robbery, the police arrested Kevin Anders on charges unrelated to the Gem Design robbery. Anders told the police that Tammy Trump and Larry Jordan had information about the robbery. The police then got and executed a search warrant for the home where Trump and Jordan lived. There, the police found a diamond and a gold chain that had been stolen from Gem Design. Trump told the police that Tommy Hartz and a friend had robbed a jewelry store in Bellevue. Trump claimed that on the morning of the robbery, Hartz and his accomplice had each carried a gun and that they had prepared for the robbery in her home, donning fake mustaches and wigs to disguise their appearances, and discussing their plan to handcuff anyone they found in the store. She claimed that Hartz and his accomplice returned to her home later that day, carrying bags filled with jewelry and bragging about the heist. Trump told the police that she had driven Hartz to a travel trailer where he was staying, but beforehand,

without Hartz's knowledge, she had taken a few pieces of stolen jewelry to keep for herself and her son. Trump then led the police to the travel trailer. Based on Trump's information, which Jordan corroborated, the police applied for and executed a search warrant for the travel trailer.

There, the police recovered twenty necklaces and other valuables stolen from Gem Design, a .357-caliber Smith & Wesson revolver, and a Chinese 9mm semiautomatic pistol. The police also found materials that could be used to create disguises, including fake mustaches, wigs, hair dye, false teeth, and a home-made foam vest that would increase the wearer's perceived bulk. Further, the police found items confirming that Hartz lived in the trailer, including a medical bracelet with Hartz's name on it, a Polaroid picture of Hartz, and a receipt that recorded the sale of a .38-caliber revolver to "Terry Hartz." With the items found in the trailer and the information from Trump and Jordan, the police obtained a warrant to arrest Tommy Hartz.

At about 1:00 A.M. on the morning of July 25, 2000, two Pierce County Sherriff's deputies, William Pebley and Daniel Wulick, received a radio message that an orange, 1977 Chevrolet pickup truck had been carjacked in Tacoma, Washington. The message reported that one carjacker was a man, that the other suspect was a woman, and that the stolen truck's license plate number was 03181L.[2]

Three hours later, around 4:00 A.M., Pebley and Wulick saw a 1977 Chevrolet pickup truck that seemed to match the description of the truck stolen in Tacoma. Following it, the deputies noticed that the truck's license plate was new, unlike the truck, which was old and in poor condition. They also

---

[2]At a Washington state court suppression hearing, Pebley testified that he remembered the report describing the carjacking suspects as an African-American man and a white woman. Wulick testified that the report said that one suspect was a man and the other a woman.

noticed that the license plate was attached to the truck with "zip ties," and that the license plate number was A04386I, which did not match the stolen truck's license plate number. License plate number A04386I belonged to a red, 1977 Chevrolet pickup truck, rather than an orange one. The deputies saw two persons in the pickup. The passenger was white, had long hair, and appeared to be a woman. The officers stopped the truck.

As Wulick approached the driver's side of the truck, he saw both bullets and a knife on the dashboard. He then asked the driver, Reese Hinkle, to step out of the truck, told Pebley that there were bullets on the dashboard, and instructed Pebley to remove the passenger from the truck. Hartz was the passenger, and as he stepped out of the truck, Wulick saw a gun sitting on the seat. After frisking Hinkle for weapons, Wulick decided to frisk Hartz as well. At a suppression hearing in Washington state court, Wulick testified that he frisked Hartz because the gun inside the truck suggested that Hartz might be armed. While frisking Hartz, Wulick found, in a front pocket of Hartz's pants, an Altoids container and a golf-ball-sized bundle of cellophane wrapped with duct tape. Wulick testified in state court that when he felt the Altoids container and the wad of duct-tape wrapped cellophane together, he thought they were a weapon or that they might contain a weapon. Inside the Altoids tin, Wulick found a bundle of pills, but no information identifying them. In Hartz's other pocket, Wulick felt a narrow object, about four inches long, that Wulick thought was a knife. Removing this object from Hartz's pocket, Wulick saw that it was a marijuana pipe, made of a brass pipe fitting and tubing. Wulick then arrested Hartz for "drug paraphernalia." After arresting Hartz, the deputies conducted a full search of his pockets, and discovered a piece of paper listing items of jewelry and their values.

Before the search, Pebley had asked Hartz for his name and Hartz had identified himself as "Terry Hartz." After his arrest, however, the deputies found Hartz's identification, as Tommy

Hartz, inside the truck. The deputies had previously checked to see whether there was a warrant to arrest Terry Hartz and learned that there was not. They checked again after discovering Tommy Hartz's identity and learned that he was wanted for his role in the Gem Design robbery.[3]

In a superceding indictment presented on March 13, 2003, a federal grand jury charged Hartz with four crimes: conspiracy to commit interference with commerce by robbery, in violation of 18 U.S.C. § 1951 (count 1); interference with commerce by robbery, in violation of 18 U.S.C. § 1951 (count 2); use of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii) (count 3); and unlawful possession of a firearm having been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1) (count 4).[4] In part, count three alleged that Hartz "did use and carry, and did aid and abet in the use and carrying of, firearms, to wit, a Smith & Wesson .357 caliber, Model 65-5 revolver; and a Chinese 9mm Model 2139X1 semiautomatic pistol." Similarly, count four alleged in part that Hartz "did knowingly and unlawfully possess . . . the following firearms, which had been shipped and transported in interstate and foreign commerce: a Smith & Wesson .357 caliber, Model 65-5 revolver; and a Chinese 9mm Model 2139X1 semiautomatic pistol."

Before trial, Hartz filed a motion to suppress the jewelry list found in his pocket and his statement to the police identifying himself as "Terry" rather than Tommy Hartz. The district court denied the motion, without holding an evidentiary hearing, concluding that the deputies had probable cause to stop Hinkle's truck, that the deputies lawfully frisked Hartz given their reasonable suspicion that he might be armed, and that there was probable cause to arrest Hartz because Wulick

---

[3]The deputies arrested Hinkle, the driver of the pickup truck, under warrants for "physical control" and "possession of drug paraphernalia."

[4]The district court severed count four from the first three counts of the indictment.

had found a marijuana pipe and "prescription pills without a prescription" in Hartz's pocket.

Before jury deliberations, the district court gave the jury a standard verdict form and a special verdict form pertaining to count three. The special verdict form asked the jury to answer "yes" or "no" to three questions: (1) whether the jury found unanimously that Hartz brandished a firearm during and in relation to the crime of violence; (2) whether the jury found unanimously that Hartz used or aided and abetted the use of the Smith & Wesson .357 revolver during and in relation to the crime of violence; and (3) whether the jury found unanimously that Hartz used or aided and abetted the use of the Chinese 9mm during and in relation to the crime of violence. During its deliberations, the jury sent the district judge a question about the special verdict form, asking whether its answer to question one could be the "opposite" of its answers to questions two and three. The district court reiterated its instruction that the jury should not fill out the special verdict form unless it found Hartz guilty on count three, but that if it did find Hartz guilty on count three that it "answer all the questions on the special verdict form as well as the verdict form itself." The jury then resumed its deliberations.

The jury found Hartz guilty on the first three counts of the indictment. On the special verdict form, the jury answered "yes" to question one, finding unanimously that Hartz brandished a firearm during and in relation to a crime of violence. The jury answered "no" to questions two and three, however, indicating respectively that they were not unanimous that Hartz had used or aided and abetted the use of the .357 revolver, and that they were not unanimous that Hartz had used or aided and abetted the use of the Chinese 9mm.

The district court then instructed the jury to consider whether Hartz was guilty of count four, being a felon in possession. For purposes of the allegations in count four, the parties had stipulated that before July 21, 2000, Hartz had been

convicted of a crime punishable by more than one year of imprisonment. The parties had also stipulated that the firearms admitted into evidence as exhibit 18 — the Smith & Wesson .357-caliber revolver, and the Chinese 9mm pistol — had been shipped in interstate commerce. Thus, under the district court's instructions, the question presented for the jury as to count four was whether Hartz had possessed one of the identified guns between the dates specified in the indictment. The jury found Hartz guilty on count four. The district court sentenced Hartz to a twenty-two year term of imprisonment and a five-year term of supervised release.

## II

### A

We first address Hartz's claim that the district court should have suppressed the list of stolen jewelry found in Hartz's pocket, and Hartz's statement misidentifying himself as "Terry" rather than Tommy Hartz.[5] Hartz argues that the traffic stop, the resulting search for weapons, and his arrest for possession of narcotics paraphernalia were unreasonable under the Fourth Amendment, which guarantees that: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. CONST. amend. IV. When the police stop a vehicle, they seize its occupants for purposes of the Fourth Amendment, so the decision to stop Hinkle's truck must have been reasonable to comply with the Fourth Amendment. *See United States v. Garcia*, 205 F.3d 1182, 1186 (9th Cir. 2000) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)).

---

[5]We review a district court's denial of a motion to suppress de novo and the factual findings underlying its ruling for clear error. *See United States v. Ruiz*, 428 F.3d 877, 880 (9th Cir. 2005). We may affirm the district court's suppression ruling on any basis fairly supported by the record. *See id.*

**[1]** A police-initiated traffic stop is reasonable under the Fourth Amendment if the police stop the vehicle because of a "reasonable suspicion" that the vehicle's occupants have broken a law. *United States v. Lopez-Soto*, 205 F.3d 1101, 1104-05 (9th Cir. 2000) ("We . . . reaffirm that the Fourth Amendment requires only reasonable suspicion in the context of investigative traffic stops."). Reasonable suspicion exists if "specific, articulable facts . . . together with objective and reasonable inferences" suggest that the persons detained by the police are engaged in criminal activity. *Id.* at 1105 (internal quotation marks and citations omitted). Here, the facts and reasonable inferences warranted the deputies' reasonable suspicion that the occupants of the truck they were following had stolen it at gun point, a felony under Washington law. *See* WASH. REV. CODE ANN. §§ 9A.56.070 (taking motor vehicle without permission in the first degree); 9A.56.200 (robbery in the first degree) (West 2000). In the course of their duties, deputies Pebley and Wulick saw a 1977 Chevrolet pickup truck that matched the description of a truck recently stolen in Tacoma. The license plate corresponded to a red pickup truck, and both Pebley and Wulick testified that they thought the truck they stopped was orange. The license plate appeared to be new, and it was attached to the truck with "zip ties," suggesting that the license plate had recently been attached to the truck. Under these circumstance, the deputies' continuing suspicions were reasonable, even though the license plate number did not match the number of the stolen truck. As Wulick and Pebley each testified, the carjackers might have switched license plates with a similar-looking truck to increase their chance of avoiding capture.[6] As we have said:

---

[6]At a suppression hearing in Washington state court, Deputy Pebley testified that: "It is common . . . when somebody steals a car or carjacks a car to switch the license with a different vehicle. That way when the police run that license, it won't come back as the vehicle that was stolen." Deputy Wulick testified similarly: "It's very common when people, when suspects steal vehicles, they change the plates immediately and a lot of times they will change it with a similar vehicle. So if the police run it, they are kind of thrown off."

"[A] mere mistake of fact will not render a stop illegal, if the objective facts known to the officer gave rise to a reasonable suspicion that criminal activity was afoot." *United States v. Mariscal*, 285 F.3d 1127, 1131 (9th Cir. 2002); *see also United States v. Dorais*, 241 F.3d 1124, 1130-31 (9th Cir. 2001) (affirming district court's denial of a motion to suppress where a rental car agency told the police that a rental car was "overdue," because the report warranted a reasonable suspicion that the rental car had been stolen, even though the car was not in fact "overdue" (internal quotation marks omitted)). We conclude that the traffic stop was reasonable under the circumstances and that it did not violate the Fourth Amendment.[7]

**[2]** Under *Terry v. Ohio*, 392 U.S. 1 (1968), a police officer who reasonably believes that a suspect could be "armed and presently dangerous" may frisk the suspect "to determine whether the person is . . . carrying a weapon." *Id.* at 24. Such a search, however, "must be strictly 'limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby.' " *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (quoting *Terry*, 392 U.S. at 26). Here, Wulick had good reason to suspect that Hartz could be armed and dangerous. Wulick suspected that Hartz might have been involved in a carjacking, and had already observed a knife, a gun, and ammunition in the truck in which Hartz was a passenger. The decision to frisk Hartz was reasonable. As Wulick conducted the patdown search, he felt three items: an Altoids tin, containing prescription pills without a prescription; a marijuana pipe, made of a brass pipe fitting and plastic tubing; and golf-ball-sized celophane bundle wrapped in duct

---

[7]Nor did the deputies violate the Fourth Amendment by ordering Hartz to exit the truck. As we have said, "it is well established that an officer effecting a lawful traffic stop may order the driver and the passengers out of a vehicle." *United States v. Williams*, 419 F.3d 1029, 1030 (9th Cir. 2005); *see also Maryland v. Wilson*, 519 U.S. 408, 415 (1997) ("We therefore hold that an officer making a traffic stop may order passengers to get out of the car pending completion of the stop.").

tape. Wulick testified that he thought each of these items could be, or could conceal, a weapon.

Relying on our decision in *United States v. Miles*, 247 F.3d 1009 (9th Cir. 2001), Hartz urges that Wulick exceed the scope of a permissible patdown search under *Terry*. But *Miles* is inapposite here. In *Miles*, we suppressed evidence discovered during a patdown search, noting that: "The government suggests that the officer might legitimately have been looking for a tiny pen knife, needle, or other slender weapon. But the officer did not testify to such a motivation." *Id.* at 1015. Here, however, Officer Wulick did testify that he thought the items in Hartz's pockets might be weapons. Consequently, we conclude that Wulick conducted a valid patdown search under *Terry*.

**[3]** A police officer has probable cause to arrest a suspect without a warrant if the available facts suggest a "fair probability" that the suspect has committed a crime. *United States v. Valencia-Amezcua*, 278 F.3d 901, 906 (9th Cir. 2002). The presence of a marijuana pipe in Hartz's pocket, together with undocumented prescription pills, created a "fair probability" that Hartz had committed a crime, namely use of drug paraphernalia. Under Washington law, it is illegal for any person "to use drug paraphernalia to . . . ingest, inhale, or otherwise introduce into the human body a controlled substance." WASH. REV. CODE ANN. § 69.50.412(1) (West 2005). A marijuana pipe is drug paraphernalia. *See* WASH. REV. CODE ANN. § 69.50.102(a)(12) (defining "drug paraphernalia," including: "Objects used, intended for use, or designed for use in ingesting, inhaling, or otherwise introducing marihuana . . . into the human body . . . .") (West 1997). We hold that deputy Wulick had probable cause to arrest Hartz. *Cf. State v. Neeley*, 52 P.3d 539, 543 (Wash. Ct. App. 2002) (affirming denial of a motion to suppress where the defendant "possessed the drug paraphernalia in circumstances giving rise to probable cause that she was using the paraphernalia to ingest a controlled substance").

**[4]** Because Wulick had probable cause to arrest Hartz, searching inside the truck was a constitutionally permissible search incident to arrest, as was a full search of Hartz's person. *See United States v. Robinson*, 414 U.S. 218, 226 (1973); *United States v. Fixen*, 780 F.2d 1434, 1438 (9th Cir. 1986) ("[W]hen a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." (quoting *New York v. Belton*, 453 U.S. 454, 460 (1981) (internal quotation marks omitted))). While searching Hartz, the deputies lawfully discovered a list of jewelry stolen from Gem Design. While searching Hinkle's truck, they discovered Hartz's identification, which revealed his previous misidentifying statement. The district court correctly denied Hartz's motion to suppress evidence.

## B

We turn to Hartz's argument that the jury instructions given by the district court constructively amended counts three and four of the indictment, allowing the jury to convict him of crimes that the grand jury did not charge. Counts three and four each mentioned two firearms specifically, a Smith & Wesson .357 revolver, and a Chinese 9mm semiautomatic pistol. The district court's instructions regarding counts three and four, however, referred to "a firearm." Hartz contends: (1) that because the indictment described two specific guns, the government had to prove that Hartz used the weapons mentioned in the indictment to commit the crimes alleged in counts three and four; (2) that the special verdict form returned by the jury indicates that it convicted him based on a weapon other than the two guns described in the indictment; and (3) that a verdict based on a gun other than the two described in the indictment is a constructive amendment, requiring us to overturn his conviction.

Where a defendant raises a constructive amendment claim before the district court, we review the claim de novo. *United*

*States v. Adamson*, 291 F.3d 606, 612 (9th Cir. 2002). Because Hartz did not object to the district court's jury instructions, however, we review his constructive-amendment claim for plain error. *United States v. Arreola*, 446 F.3d 926, 934 & n.2 (9th Cir. 2006); *United States v. Hugs*, 384 F.3d 762, 766 (9th Cir. 2004). Under Federal Rule of Criminal Procedure 52(b), we may not reverse Hartz's conviction unless the district court committed a plain error that affected Hartz's substantial rights. *See Hugs*, 384 F.3d at 767. If there was such an error, however, we may correct it at our discretion "if the error seriously affect[ed] the fairness, integrity or public reputation of the judicial proceedings." *United States v. Olano*, 507 U.S. 725, 736 (1993).

**[5]** The Fifth Amendment guarantees that: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . ." U.S. CONST. amend. V. In *Stirone v. United States*, 361 U.S. 212, 215-16 (1960), the United States Supreme Court declared that: "[A]fter an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself." The Supreme Court recognized, however, that minor differences between an indictment and the proof offered at trial could be dismissed as "nothing more than a variance." *Id.* at 217. In *United States v. Von Stoll*, 726 F.2d 584, 586 (9th Cir. 1984), we explained the difference between a variance and a constructive amendment. We said that "[a]n *amendment* . . . occurs when the charging terms of the indictment are altered, either literally or in effect, by the prosecutor or a court after the grand jury has last passed upon them." *Id.* A variance, on the other hand, "occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." *Id.* Although "[t]he line between a constructive amendment and a variance is at times difficult to draw," the difference is quite significant because a constructive amendment requires reversal, while a variance

does not, unless it prejudices the defendant's substantial rights. *Adamson*, 291 F.3d at 615.

Relying on our decision in *Howard v. Dagget*, 526 F.2d 1388 (9th Cir. 1975) (per curiam), and the decision of the United States Court of Appeals for the Seventh Circuit in *United States v. Leichtnam*, 948 F.2d 370 (7th Cir. 1991), Hartz argues that the jury instructions at issue here constructively amended the indictment. In *Howard*, we reversed a conviction under 18 U.S.C. § 1952 for interstate travel in aid of prostitution. 526 F.2d at 1388. The indictment alleged that Howard traveled in interstate commerce "for the purpose of promoting an unlawful activity, to-wit: prostitution, in that [Howard] did induce Lucretia Yvonne South and Dolores Nelson to engage in prostitution." *Id.* at 1389. At trial, however, the government introduced evidence of Howard's relationships with several women who were not named in the indictment, as well as the two women who were. *Id.* at 1390. During deliberations, the jury sent a note to the district court, indicating that it was confused whether to follow the indictment's language, which named two specific women, or the court's instructions, which did not. *Id.* at 1389-90. The district court issued a supplemental instruction that any language in the indictment that did not appear in the jury instructions was "surplusage" and could be disregarded. *Id.* at 1390. Observing that the district court's decision to admit evidence regarding women who were not named in the indictment "allow[ed] the jury to convict of a charge not brought by the grand jury," we held that the supplemental instruction was a constructive amendment under *Stirone*. *Id.*

In *Leichtnam*, the Seventh Circuit reversed a conviction under 18 U.S.C. § 924(c) where the indictment charged the defendant with using and carrying a firearm, "to wit: a Mossberg rifle, Model 250CA with no serial number, during and in relation to . . . drug trafficking." 948 F.2d at 374 (internal quotation marks omitted). The evidence at trial included not just the Mossberg, but two additional guns. *Id.* at 379. Even

though the indictment described only one gun — the Mossberg — the district court instructed the jury that it could convict Leichtnam if it found that he had used any of the guns introduced into evidence. *Id.* at 374-75, 379. Viewing the words "a Mossberg" as an essential part of the charge, the Seventh Circuit reversed Leichtnam's conviction, holding that the jury instructions, "together with" the district court's decision to admit evidence of two firearms that were not described in the indictment, "impermissibly amended the indictment." *Id.* at 380-81.

**[6]** We distinguish *Howard* as inapposite and *Leichtnam* similarly does not apply here because neither case addresses facts similar to those presented in this appeal. As we previously explained in *United States v. Garcia-Paz*, 282 F.3d 1212, 1216 (9th Cir. 2002), *Howard* and *Leichtnam* belong to a line of cases in which "the difference between the indictment and the jury instructions allowed the defendant to be convicted on the basis of *different behavior* than that alleged in the original indictment." Critically, in *Howard* and *Leichtnam*, the proof offered at trial differed from the allegations set forth in the indictment, permitting the jury to convict the defendants based on behavior that was not charged in the indictment. *See Howard*, 526 F.2d at 1390 (noting that the district court admitted evidence of the defendant's relationships with women who were not named in the indictment); *Leichtnam*, 948 F.2d at 379 (noting that the district court admitted evidence of two guns that were not described in the indictment).[8] Here, however, that was not the case; the proof offered at trial matched the charges made in the indictment.

---

[8]There is an additional reason why we do not consider *Leichtnam* to be persuasive; the Seventh Circuit did not decide *Leichtnam* under the plain error standard. *United States v. Algee*, 309 F.3d 1011, 1016 (7th Cir. 2002). As the Seventh Circuit has said, "had our review [in *Leichtnam*] been limited to a search for plain error . . . the conviction would likely have been upheld as there was enough evidence to support a finding that the defendant had used and carried the specific firearm identified in the indictment." *Id.* (citing *Leichtnam*, 948 F.2d at 375).

The testimony and exhibits offered by the government suggested that Hartz had robbed Gem Design using one of the weapons described in the indictment. Hartz concedes that during his trial the government did not suggest that he robbed Gem Design with a gun other than the .357 revolver or the 9mm semiautomatic.

**[7]** As was the case in *Garcia-Paz*, the difference between the indictment and the jury instructions in this case "more closely resembles another line of cases which permits conviction despite variance . . . so long as the [variance] does not alter the behavior for which the defendant can be convicted." 282 F.3d at 1216. Following this line of authority, we hold that the language in the indictment describing the .357 and the 9mm was surplusage, rather than an essential element of the crimes for which Hartz was charged, and that the difference between the indictment and the jury instructions was a variance that did not alter the behavior for which Hartz could be convicted. *See id.* at 1217 ("[18 U.S.C. § 545] prohibits smuggling of 'merchandise.' Whether that merchandise is illegal medicine or marijuana does not matter under the statute. Thus, the phrase 'to wit, marijuana' is surplusage, and does not render the jury's conviction of Garcia-Paz . . . a violation of Garcia-Paz's Fifth Amendment rights" (internal citation omitted)); *United States v. Munoz*, 150 F.3d 401, 417 (5th Cir. 1998) (concluding that there was no constructive amendment where indictment alleged defendant possessed a 12-gauge shotgun, while evidence showed the weapon was a 20-gauge shotgun, because 18 U.S.C. § 922(g) does not "designate the gauge an essential element of the offense it defines"); *United States v. Redd*, 161 F.3d 793, 796 (4th Cir. 1998) (concluding that there was no constructive amendment where indictment alleged that defendant used a "black revolver" during a crime of violence but evidence showed the weapon was silver because "the description of a 'black revolver' was not an essential element of the crime charged"); *United States v. McIntosh*, 23 F.3d 1454, 1457 (8th Cir. 1994) ("Allegations in the indictment that are not necessary to establish a violation

of a statute are surplusage and may be disregarded if the remaining allegations are sufficient to charge a crime."); *United States v. Hamilton*, 992 F.2d 1126, 1131 (10th Cir. 1993) (concluding that there was no constructive amendment where the indictment alleged the defendant used a .38-caliber revolver, but the evidence showed that the defendant used a gun of unknown caliber); *United States v. Robison*, 904 F.2d 365, 369 (6th Cir. 1990) ("We believe that the district court's instructions were a variance, not a constructive amendment, because the specific type of firearm used or possessed by the conspirator is not an essential element of the crime."); *Soper v. United States*, 220 F.2d 158, 161 (9th Cir. 1955) (holding that a jury instruction striking the description of a firearm as an "M-1" rifle did not amend the indictment because the description was surplusage).

Moreover, we conclude that the variance at issue here did not prejudice Hartz's substantial rights. Hartz contends that the difference between the indictment and the jury instructions prejudiced his substantial rights because the "special verdict raises at least a serious concern . . . that the jury convicted . . . based on a different gun."[9] Under *Olano*, however,

---

[9]We do not agree with Hartz's characterization of the jury's special verdict form, which he says "proves beyond doubt that the jurors convicted Hartz on count 3 based on a gun other than the two charged in the indictment." Although Hartz argues that the answers on the special verdict form mean that Hartz did not use *either* the .357 or the 9mm during the Gem Design robbery, the special verdict form and its answers do not have to be read this way. In our view, the special verdict form indicates that the jury agreed Hartz used a firearm during the Gem Design robbery, and based on the evidence before the jury it is most likely that jurors simply disagreed whether he used the .357 or the 9mm. *See Arreola*, 446 F.3d at 935 (noting that we interpret jury verdicts in light of the trial as a whole). Essentially, the special verdict form posed the wrong question. The pertinent question was not whether the jury was unanimous as to which gun Hartz used, but whether they were unanimous that he used *either* the .357 revolver *or* the 9mm semiautomatic pistol. Our interpretation is supported by the jury's verdict and by the trial record. In its written verdict, the jury found Hartz guilty of using a firearm during and in relation to a crime of

Hartz has the burden to prove that the error he asserts prejudiced his substantial rights. He has not met that burden because he has made no effort to refute the government's evidence suggesting that he robbed Gem Design using one of the weapons described in the indictment.

[8] Further, it is unlikely that Hartz could have shown prejudice had he tried. The grand jury clause of the Fifth Amendment is designed to ensure that criminal defendants have fair notice of the charges that they will face and the theories that the government will present at trial. *See Adamson*, 291 F.3d at 616. A minor difference between the indictment and the jury instructions that does not affect an essential element of the offense does not risk blindsiding a defendant with an unforeseeable basis of liability or prosecution strategy. *See Redd*, 161 F.3d at 796. The difference between indictment and jury instructions here was minor and, as we have said, in the nature of a variance. Hartz's theory of the case was that Tammy Trump and Larry Jordan robbed Gem Design and then planted the guns and stolen merchandise in Hartz's trailer. Thus, Hartz's defense strategy was not affected by the variance between the indictment and the jury instructions. *See id.* (rejecting defendant's claim that his defense was impaired where the indictment described a "black revolver" but evidence showed the gun was silver because "[w]hether the gun

violence "as charged in Count 3," and on the special verdict, the jury found unanimously that Hartz brandished a firearm. Also, all of the evidence at trial pertaining to the robbery referred to the guns described in the indictment. Finally, to the extent that the special verdict form was ambiguous, especially in light of the evidence presented at trial, Hartz had an opportunity to resolve the ambiguity while the jury was still empaneled. *See generally United States v. Vasquez-Velasco*, 15 F.3d 833, 847 (9th Cir. 1994) ("[A] defendant should not benefit from trial court decisions that lead to ambiguities that counsel failed to resolve at trial."); *Larson v. Neimi*, 9 F.3d 1397, 1402 (9th Cir. 1993) ("[I]t makes a good deal of sense to require trial and appellate courts to do all they can to reconcile special verdict answers when the only alternative is ordering a new trial.").

was black or silver is irrelevant to the question of whether one was used during the robbery."). This is not a case like *Adamson*, where the difference between the indictment and the proof offered at trial "affirmatively misled the defendant and obstructed his defense at trial." *See* 291 F.3d at 616. As Hartz concedes in his opening brief: "The prosecutor never suggested to the jury that Hartz might have used [the .38-caliber] gun in the robbery." The receipt recording the sale of a .38-caliber gun to "Terry Hartz" was introduced into evidence to prove that the trailer from which the police recovered the guns and the stolen merchandise belonged to Tommy Hartz. We conclude that the jury would have convicted Hartz even if the jury instructions had mirrored the indictment's language perfectly. We therefore reject Hartz's assertion that the variance between the indictment and the jury instructions prejudiced his substantial rights, and hold that the variance here was not a plain error warranting relief.[10]

## C

We finally address Hartz's claim that the evidence offered at trial was insufficient to warrant the jury's verdict on counts three and four. Because Hartz moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29, we review his sufficiency claim de novo. *See United States v. Carranza*, 289 F.3d 634, 641 (9th Cir. 2002). The evidence against Hartz was sufficient if, "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

---

[10]In *Algee*, a case similar to this one in certain respects, the Seventh Circuit rejected a constructive amendment claim under plain error review because the defendant had made no attempt to show prejudice beyond arguing that "the government 'cannot prove that the jury did not convict [him] based upon the evidence introduced regarding the three additional firearms not specifically listed in the Superseding Indictment.' " 309 F.3d at 1016.

**[9]** To convict Hartz under 18 U.S.C. § 924(c)(1)(A)(ii), the government had to prove that during and in relation to a crime of violence, here interference with interstate commerce by robbery, Hartz used or carried a firearm, and that Hartz brandished the firearm. 18 U.S.C. § 924(c)(1)(A)(ii). Hartz contends that the special verdict form returned by the jury "precludes any argument that [he] used or possessed the charged guns during the robbery." Hartz further argues that there was insufficient evidence that Hartz used a different gun to rob Gem Design. For the reasons stated earlier, we reject the argument that the special verdict form meant that the jury convicted him based on use of a gun other than the two charged in the indictment, as contrasted with the jurors splitting on which of the two named guns he used. Second, the special verdict form is of marginal relevance, if not irrelevant, to our inquiry because we review the evidence admitted at trial de novo. The sufficiency of evidence question is not, as Hartz would have it, whether this jury thought he robbed Gem Design using one of the guns named in the indictment, but rather whether "*any* rational trier of fact" could conclude that Hartz used and brandished a firearm during a crime of violence. *Jackson*, 443 U.S. at 319.

**[10]** The evidence offered at trial clearly and unmistakably suggested that Hartz had robbed Gem Design at gunpoint. Marciel identified one of the guns found in the travel trailer as the gun that had been used in the robbery, and Marciel identified Hartz as the gunman, in light of Hartz's voice and appearance. Trump testified that both Hartz and his accomplice carried guns on the day of the robbery. A jury might have decided to credit Hartz's theory of the case, that Trump and Jordan robbed Gem Design and then planted evidence to frame Hartz, but a jury was not required to do so. *United States v. Toomey*, 764 F.2d 678, 681 (9th Cir. 1985) ("It is the jury's duty to weigh the evidence and determine what version of the facts to believe."). We hold that the evidence was sufficient to warrant a rational jury's conclusion that Hartz used

and brandished a firearm during and in relation to a crime of violence.

To convict Hartz under 18 U.S.C. § 922(g)(1), the government had to prove: (1) that Hartz had been convicted of a crime punishable by imprisonment for a term exceeding one year; (2) that Hartz possessed a firearm; (3) that the firearm had been shipped or transported in interstate or foreign commerce. *See* 18 U.S.C. § 922(g)(1); *see United States v. Beasley*, 346 F.3d 930, 933-34 (9th Cir. 2003). Hartz argues that if the jury convicted him based on the .38-caliber weapon referred to in the receipt found in the travel trailer, then there was no evidence that the gun traveled in interstate commerce and therefore no evidence supported an essential element of the crime.

[11] Viewing the evidence discussed above in the light most favorable to the government, however, a rational jury could have concluded that when Hartz robbed Gem Design, he possessed either the .357 revolver or the 9mm pistol described in the indictment, each of which had been stipulated by the parties to have traveled in interstate commerce.[11] The parties further stipulated that Hartz had been convicted of a felony. We hold that there was sufficient evidence for a rational jury to conclude beyond a reasonable doubt that Hartz had been convicted of a felony, and that between June 21, 2000

---

[11]The evidence was also sufficient to warrant a rational jury's conclusion that the travel trailer belonged to Hartz. The police found several items that belonged to Hartz in the same travel trailer where the police found the .357 revolver and the 9mm semiautomatic pistol, including a receipt bearing the name "Terry Hartz." The police also found some of the jewelry stolen from Gem Design, fake mustaches, and other items suggesting that the trailer's occupant had robbed Gem Design. In light of the trial testimony given by Trump and Marciel suggesting that Hartz robbed Gem Design at gunpoint, a jury could rationally infer that the trailer where the police found the jewelry belonged to Hartz. Likewise, because the police found the .357 revolver and the 9mm semiautomatic pistol in the travel trailer as well, a rational jury could conclude that both guns belonged to Hartz.

and June 24, 2000, Hartz had possessed a firearm that had traveled in interstate or foreign commerce.

**AFFIRMED**.