*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0069p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

No. 06-6233

THOMAS M. THOMPSON,

*Defendant-Appellant.*

>

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 05-00140—Robert L. Echols, District Judge.

Submitted: October 26, 2007

Decided and Filed: February 11, 2008

Before: MERRITT, ROGERS, and McKEAGUE, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:** Thomas J. Drake, Jr., CRAIG & DRAKE, Nashville, Tennessee, for Appellant. Philip H. Wehby, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee.

McKEAGUE, J., delivered the opinion of the court, in which ROGERS, J., joined. MERRITT, J. (pp. 12-17 ), delivered a separate dissenting opinion.

_____

## OPINION

_____

McKEAGUE, Circuit Judge. A grand jury indicted Thomas M. Thompson and six co-defendants of various federal offenses related to a drug transaction that turned into an armed robbery. Thompson pleaded guilty to three criminal counts. He received 360 months of imprisonment for conspiracy to distribute five or more kilograms of cocaine and for being a felon in possession of a firearm. He also received a mandatory consecutive sentence of ten years' imprisonment for the discharge of a firearm in connection with a drug transaction.

On appeal, Thompson raises several claims of error. He contends that the district court erred when it enhanced his sentencing range under the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") for assault on an official victim and for holding a leadership role in the crime. He also argues that the district court engaged in impermissible double-counting when it used the same criminal activity to both enhance his Guidelines range and sentence him to the ten-year mandatory sentence. Finally, he argues that he should have received only a five-year sentence for

carrying and possessing a firearm during a drug transaction, rather than the ten-year sentence for discharging a firearm.

For the reasons set forth below, we affirm in part, reverse in part, and remand to the district court for the limited purpose of resentencing Thompson under 18 U.S.C. § 924(c)(1)(A).

# I

On April 6, 2005, the Metro Nashville Police Department arranged with a confidential informant (the "CI") to purchase cocaine. The CI proceeded to purchase small amounts of cocaine from several of Thompson's co-defendants. Several days later, the CI told police that he learned that Thompson wanted to purchase a large volume of cocaine. The CI met with an undercover officer who was to pose as a dealer from Chicago in order to arrange a drug transaction with Thompson.

After several rounds of negotiation, the CI and the undercover officer met Thompson in a hotel room to finalize the sale. Police had the room under video surveillance. Thompson was shown a bag containing twenty kilograms of cocaine wrapped in smaller packages. After inspecting the cocaine, Thompson left the room, ostensibly to get more money to complete the sale. He returned with the money and was accompanied by co-defendant Kenneth Jones.

Thompson and Jones turned the drug sale into an armed robbery. Both Jones and Thompson drew semiautomatic pistols on the officer and the CI. They ordered the two men to drop to the floor and not to move. Jones grabbed the bag of cocaine and money and the two fled from the hotel room.

The officers observing the drug transaction from the next room pursued Jones and Thompson down the hotel stairs, yelling, "Metro Police!" They wore jackets printed with "Police" on the sleeves and body. When one officer reached the bottom floor he noticed several kilograms of cocaine and money lying on the floor. As the officer turned the corner, Jones fired a shot in his direction. When the officer peered around the corner again, Jones fired another shot. An officer in the lobby observed Jones and Thompson running towards him. Jones fired a third shot at the officers, missing one by just a few inches. Jones and Thompson tried to hide in a vending machine area, but the police ordered them to come out and surrender, which they eventually did. The officers recovered a Ruger semi-automatic pistol and a Glock semi-automatic pistol from the top of a vending machine.

A grand jury indicted Thompson, Jones, and five other co-defendants on drug and weapons charges. Thompson was named in three of the five counts: Count One charged Thompson and five others with conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. § 846; Count Two charged Thompson with possession of a firearm as a convicted felon in violation of 18 U.S.C. § 922(g)(1); and Count Four charged Thompson with using and carrying a firearm during and in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1)(A) and 18 U.S.C. § 2. Thompson eventually pleaded guilty to all three counts.

The probation office prepared a presentence report ("PSR").[1] Beginning with a base-offense level of thirty four under the Guidelines, the office recommended a six-level enhancement under U.S.S.G. § 3A1.2(c)(1) for assaulting a law-enforcement officer during the course of an offense or flight therefrom, a four-level enhancement under U.S.S.G. § 3B1.1(a) for a leadership role in the conspiracy, and a two-level reduction under U.S.S.G § 3E1.1(a) for acceptance of responsibility. With an adjusted base-offense level of 42 and a criminal-history category of V, the office recommended a sentencing range under the Guidelines of 360 months' to life imprisonment for

---

[1]The probation office used the 2005 version of the Guidelines manual.

Counts 1 and 2. On Count 4, the office recommended that Thompson receive a mandatory minimum sentence of ten years' imprisonment. Thompson objected to the PSR.

The district court held a sentencing hearing. After receiving testimony from several of the officers at the scene and after hearing the parties' arguments, the district court sentenced Thompson to 360 months of imprisonment each on Counts One and Two, to be served concurrently, and 120 months on Count Four, to be served consecutively.

Thompson timely appealed his sentence.

## II

### A.    *Sentencing*

A district court and an appellate court have different roles in federal sentencing. The district court must consider the relevant sentencing factors set forth at 18 U.S.C. § 3553. Pursuant to the so-called parsimony provision of 18 U.S.C. § 3553(a), a district court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of § 3553(a)(2). Section 3553(a)(2) provides that the district court must consider "the need for the sentence imposed":

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

While the district court need not explicitly reference each of the sentencing factors of § 3553(a), "there must be sufficient evidence in the record to affirmatively demonstrate the court's consideration of [these factors]." *United States v. Jones*, 445 F.3d 865, 869 (6th Cir.) (internal quotation marks omitted), *cert. denied*, 127 S. Ct. 251 (2006).

The appellate court, in contrast, reviews the defendant's sentence for "reasonableness" under an abuse-of-discretion standard. *Gall v. United States*, 128 S. Ct. 586, 591 (2007).

### B.    *The Advisory Guidelines*

#### 1.    *In General*

One of the sentencing factors that the district court must consider is the applicable Guidelines range. *United States v. Gale*, 468 F.3d 929, 934 (6th Cir. 2006), *cert. denied*, 127 S. Ct. 3065 (2007). Specifically, 18 U.S.C. § 3553(a)(4) requires that the district court consider "the kinds of sentence and the sentencing range established for--(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines--(i) issued by the Sentencing Commission." The Supreme Court explained in *Gall* that the Guidelines are the "starting point and the initial benchmark" for federal sentencing. 128 S. Ct. at 596.

When considering the Guidelines, the district court must calculate the correct sentencing range. *Id.*; *Gale*, 468 F.3d at 934. In practice, this means that the court must begin at the proper base-offense level, apply any applicable enhancements or reductions to arrive at the adjusted-offense level, and use the resulting offense level with the appropriate criminal-history category to arrive at

a sentencing range. This is what the district court did in the recent Supreme Court case of *Kimbrough v. United States*, 128 S. Ct. 558 (2007). The district court began with a base-offense level of 32 and a criminal history of II for Kimbrough. *Id.* at 565. The district court then found that Kimbrough had testified falsely at his codefendant's trial and added 2 levels, resulting in an adjusted offense level of 34. *Id.* The Supreme Court favorably noted that the district court "began by properly calculating and considering the advisory Guidelines range." *Id.* at 575. Using the Guidelines range (as adjusted with any judge-found facts) as the applicable Guidelines range for purposes of § 3553(a)(4) has been the consistent practice of this court. *See, e.g.*, *United States v. Robinson*, 503 F.3d 522, 529 (6th Cir. 2007) (applying a presumption of reasonableness to a within-Guidelines sentence where the Guidelines calculation was enhanced based on judge-found facts and the resulting sentence would have been outside a non-enhanced Guidelines range); *United States v. Cook*, 453 F.3d 775, 777 (6th Cir. 2006) (explaining that "*Booker* . . . has no bearing on advisory guideline calculations"); *United States v. Stone*, 432 F.3d 651, 654-55 (6th Cir. 2005) (holding that the district court's fact-finding with respect to an obstruction of justice enhancement did not violate the Sixth Amendment and stating that "*Booker* did not eliminate judicial fact-finding"), *cert. denied*, 127 S. Ct. 129 (2006); *cf. Booker*, 543 U.S. at 257-58 (expressly rejecting the dissent's approach that would have left a sentencing judge free "to consider facts or circumstances not found by a jury or admitted in a plea agreement for the purpose of adjusting a base-offense level down, but not up, within the applicable guidelines range"). When engaging in this fact-finding, district courts employ the "same preponderance-of-the-evidence standard that governed prior to *Booker*." *United States v. Ferguson*, 456 F.3d 660, 665 (6th Cir. 2006).

Once the district court has calculated the appropriate Guidelines range, it then considers that range in light of the other relevant § 3553(a) factors in fashioning the sentence. *United States v. McBride*, 434 F.3d 470, 476 (6th Cir. 2006). We accord a presumption of reasonableness to a sentence that lies within the advisory Guidelines range. *Gale*, 468 F.3d at 937; *see Rita v. United States*, 127 S. Ct. 2456, 2462 (2007) (permitting circuit courts to apply a presumption of reasonableness to a within-Guidelines sentence).

### 2. *Guidelines Enhancement for Assault on an Official Victim*

Thompson first contends that the district court erred by enhancing his offense level under U.S.S.G. § 3A1.2 for assaulting an officer. He argues that he did not know that the purported "drug dealer" in the hotel room was actually an undercover officer. He also argues that the district court found that only Jones fired on the officers who were in pursuit of the two as they fled the hotel room.

We find no error by the district court. Section 3A1.2 provides in relevant part:

(c) If, in a manner creating a substantial risk of serious bodily injury, the defendant or a person for whose conduct the defendant is otherwise accountable--

(1) knowing or having reasonable cause to believe that a person was a law enforcement officer, assaulted such officer during the course of the offense or immediate flight therefrom; . . .

increase [the offense level] by 6 levels.

The district court made clear that the enhancement went to Thompson's conduct after the robbery, not his conduct in the hotel room. Both Thompson and Jones brandished their firearms as they fled the room. The evidence presented during the sentencing hearing also confirmed that the two defendants were on sufficient notice that the pursuing officers were, in fact, police officers.

Even assuming *arguendo* that there was insufficient evidence that Thompson himself shot at the officers, there was sufficient evidence that "a person for whose conduct" Thompson was

"otherwise accountable" created "a substantial risk of serious bodily injury." There is little dispute that Jones fired at the officers during the flight. In discussing Thompson's leadership role in the conspiracy, the district court found that Thompson "was the man in charge" because: (a) "he was the man with whom the CI negotiated to try to arrange to buy 20 kilograms of cocaine," JA 133; (b) the "negotiations continued with Thompson," *id*.; (c) "he was the man that was doing all the talking and wanted to see the cocaine," *id*.; (d) "[h]e's the one that went out and brought in Jones to try to complete the deal with his additional money," JA 134; and (e) "[h]e was also giving directions to Jones, who attempted to turn left down the hall. And he directed him, no, to go right down the hall and down the stairs at the end of the hall," *id*. Finding Thompson to be "the man in charge," it was not unreasonable for the district court also to conclude that he should be held "accountable . . . for the shots being fired by Jones." JA 131. Under U.S.S.G. § 3A1.2(c), this was sufficient to apply the six-level enhancement.

### 3.      *Guidelines Enhancement for Leadership Role*

Thompson also challenges the four-level increase he received for his leadership role in the conspiracy. The Guidelines call for a four-level enhancement if a defendant is an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). Thompson argues that the evidence points to Jones, not Thompson, as the leader. The district court recognized that Jones also played a significant role in the conspiracy and robbery. More than one person can, however, hold a leadership role in the conspiracy for purposes of the Guidelines enhancement. U.S.S.G. § 3B1.1 cmt. n.4 ("There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy."). Given that Thompson negotiated the details of the drug sale, had the money, and  checked the cocaine for quality, the district court properly concluded that he had a leadership role.

### 4.      *Double Counting*

Thompson next alleges that the district court enhanced his Guidelines offense level under U.S.S.G. § 3A1.2(c) for the same activity it sentenced him under 18 U.S.C. § 924(c)(1)(A)(iii). He argues that by doing so, the district court punished him twice for the same criminal activity. "[T]he 'established rule' in this circuit is that 'impermissible "double counting" occurs when precisely the same aspect of a defendant's conduct factors into his sentence in two separate ways.'" *United States v. Sabino*, 307 F.3d 446, 450 (6th Cir. 2002) (quoting *United States v. Farrow*, 198 F.3d 179, 193 (6th Cir.1999)). U.S.S.G. § 2K2.4(b) provides that if a defendant was convicted under 18 U.S.C. § 924(c), the term of imprisonment is that required by the statute. Thus, the question is whether the same aspect of Thompson's conduct factors into 18 U.S.C. § 924(c)(1)(A)(iii) and U.S.S.G. § 3A1.2 in two separate ways.

The district court did not engage in impermissible double counting. A key aspect of Thompson's conduct that enhanced his Guidelines range under U.S.S.G. § 3A1.2—the fact that the people Jones was shooting at were police officers and not simply private citizens—is not a factor of the crime set forth under 18 U.S.C. § 924(c)(1)(A)(iii). Thus, this is not a case where "precisely the same aspect" of a defendant's conduct impacted his sentence in two separate ways. *United States v. Sloley*, 19 F.3d 149, 154 (4th Cir. 1994) ("By their terms, there is no inherent or necessary overlap between § 924(c)(1) and § 3A1.2(b)—indeed most § 924(c) violations do not involve an 'official victim.' The mere fact that the drug trafficker in this particular case used a law enforcement officer's gun against the officer should not preclude a court from applying both the firearm statute and the 'official victim' adjustment."); *cf. United States v. Cousins*, 469 F.3d 572, 575 (6th Cir. 2006) (upholding the district court's enhancement under U.S.S.G. § 3A1.2 even though the defendant was convicted under 18 U.S.C. §§ 871(a) and 879(a)(2) for threatening the President of the United States and his family). Accordingly, we reject Thompson's claim that the district court erred by applying the enhancement under U.S.S.G. § 3A1.2.

**C.**     *Mandatory Sentence Under 18 U.S.C. § 924(c)(1)(A)*

In his final argument, Thompson asserts that the district court violated the Sixth Amendment because the discharge-of-a-firearm enhancement under 18 U.S.C. § 924(c)(1)(A)(iii) was not pled in the indictment or found by a jury beyond a reasonable doubt, in violation of the Supreme Court's holdings in *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Blakely v. Washington*, 542 U.S. 296 (2004). Had the district court sentenced him under subparagraph (i) for use and carry of a firearm, rather than (iii) for the discharge of one, he would have been subject only to a five-year, rather than ten-year, mandatory minimum sentence.

Although we reject Thompson's *Apprendi*-based argument, we do conclude that the district court committed reversible error by applying subparagraph (iii) to Thompson under the specific language of the indictment.

**1.      Harris v. United States**

Section 924(c)(1)(A) provides in relevant part:

> Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime--
>
> > (i) be sentenced to a term of imprisonment of not less than 5 years;
> >
> > (ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and
> >
> > (iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

Thompson's *Apprendi* argument is foreclosed by the Supreme Court's holding in *Harris v. United States*, 536 U.S. 545 (2002). In *Harris*, the Court held that subparagraphs (ii) and (iii) were sentencing factors that may be found by a preponderance of the evidence by a judge, rather than elements of the crime that must be found by a jury under the higher standard. *Id.* at 568. The petitioner in *Harris* had argued that the Court's decision in *Apprendi* conflicted with its earlier decision in *McMillan v. Pennsylvania*, 477 U.S. 79 (1986). In *Apprendi*, the Court explained, "[O]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. However, fourteen years earlier, the Court in *McMillan* "had declined to adopt a more restrictive constitutional rule. *McMillan* sustained a statute that increased the minimum penalty for a crime, though not beyond the statutory maximum, when the sentencing judge found, by a preponderance of the evidence, that the defendant had possessed a firearm." *Harris*, 536 U.S. at 550 (discussing *McMillan*). The two earlier decisions could be reconciled, according to the Court:

> . . . *McMillan* and *Apprendi* are consistent because there is a fundamental distinction between the factual findings that were at issue in those two cases. *Apprendi* said that any fact extending the defendant's sentence beyond the maximum authorized by the jury's verdict would have been considered an element of an aggravated crime—and

thus the domain of the jury—by those who framed the Bill of Rights. The same cannot be said of a fact increasing the mandatory minimum (but not extending the sentence beyond the statutory maximum), for the jury's verdict has authorized the judge to impose the minimum with or without the finding. As *McMillan* recognized, a statute may reserve this type of factual finding for the judge without violating the Constitution.

*Id.* at 557.

*Blakely*, in turn, applied the holding of *Apprendi* in reviewing a state judge's enhancement of a defendant's sentence above the statutory maximum. 542 U.S. at 301. The Supreme Court distinguished *McMillan*, explaining that the decision was not on-point because it "involved a sentencing scheme that imposed a statutory minimum if a judge found a particular fact." *Id.* at 304 (citing *Harris* in support). Pointedly, *Blakely* did not reverse either *McMillan* or *Harris*. Likewise, when presented with a similar question in *Booker*, the Court did not overturn or otherwise comment negatively about the continuing vitality of *McMillan* or *Harris*.

Prior panels of this court have recognized that *Harris* is still controlling, even post-*Blakely* and *Booker*. *See, e.g.*, *United States v. Gonzalez*, 501 F.3d 630, 643 (6th Cir. 2007) ("The application of this mandatory minimum [of five years under 21 U.S.C. § 841(b)(1)(B)] creates no *Apprendi* problem, moreover, because five years does not exceed the statutory maximum of twenty years' imprisonment that can be imposed . . . under 21 U.S.C. § 841(b)(1)(C)." (citing *United States v. Wade*, 318 F.3d 698, 705 (6th Cir. 2003) (holding that *Harris* confined the constitutional requirements of *Apprendi* to factors that increase a defendant's sentence beyond the otherwise-applicable statutory maximum))); *United States v. Bowen*, 194 F. App'x 393, 404 (6th Cir. 2006) (explaining that the court could "see no reason to hold *Harris* has been implicitly overruled by *Booker* and *Blakely*"). Other courts have similarly recognized the vitality of *Harris*. *United States v. Williams*, 464 F.3d 443, 449 (3d Cir. 2006) ("*Harris* remains binding law in the wake of the *Booker* decision."); *United States v. Estrada*, 428 F.3d 387, 391 (2d Cir. 2005) ("[W]e are bound by the Supreme Court's rulings in *AlmendarezTorres* and *Harris*."); *United States v. Dare*, 425 F.3d 634, 641 (9th Cir. 2005) ("We cannot question *Harris*' authority as binding precedent."); *United States v. Jones*, 418 F.3d 726, 732 (7th Cir. 2005) ("Under *Harris*, which the Supreme Court did not disturb in *Booker*, imposition of the ten-year mandatory minimum sentence for violation of 924(c)(1)(A)(iii) did not violate the Sixth Amendment."). While Thompson asks us, in effect, to find that *Harris* has been implicitly overruled by *Blakely* and *Booker*, we do not have the authority to do that. *Williams*, 464 F.3d at 449 (citing cases); *see also Agostini v. Felton*, 521 U.S. 203, 237 (1997) (reaffirming the rule that "[i]f a precedent of [the] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions"). Accordingly, we deny Thompson's *Apprendi* challenge.

## 2.        *Exceeding the Scope of the Indictment*

Yet, while we find no error under *Apprendi*, we do conclude that the district court erred in applying subparagraph (iii) under the particular language of the indictment. Courts have long understood that a criminal indictment holds a central place under the U.S. Constitution. It

protects three constitutional due process rights, namely: the Sixth Amendment's right to fair notice of the criminal charges against which one will need to defend; and the Fifth Amendment's dual protections against twice placing a defendant in jeopardy for the same offense, and holding the defendant to answer for crimes not presented to or indicted by a grand jury.

*United States v. Combs*, 369 F.3d 925, 935 (6th Cir. 2004) (quoting *United States v. Pandilidis*, 524 F.2d 644, 648 (6th Cir. 1975)). The grand jury is vested with the exclusive authority of setting the criminal charges in an indictment.

The grand jury charged both Thompson and Jones with violating § 924(c)(1)(A). Specifically, the indictment reads in relevant part:

### COUNT THREE

THE GRAND JURY FURTHER CHARGES:

On or about April 26, 2005, in the Middle District of Tennessee, **KENNETH L. JONES**, knowingly used, carried, and discharged a firearm, to-wit: a Glock, Model 21, .45 caliber, semi-automatic pistol, during and in relation to a drug trafficking crime for which he may be prosecuted in a court of the United States, to-wit: a violation of Title 21, United States Code, Sections 846 and 841(a)(1).

In violation of Title 18, United States Code, Section 924(c), and Title 18, United States Code, Section 2.

### COUNT FOUR

THE GRAND JURY FURTHER CHARGES:

On or about April 26, 2005, in the Middle District of Tennessee, **THOMAS M. THOMPSON**, knowingly used and carried a firearm, to-wit: a Ruger, Model P94, .40 caliber, semi-automatic pistol, during and in relation to a drug trafficking crime for which he may be prosecuted in a court of the United States, to-wit: a violation of Title 21, United States Code, Sections 846 and 841(a)(1).

In violation of Title 18, United States Code, Section 924(c), and Title 18, United States Code, Section 2.

By the terms of Count 4, the grand jury charged Thompson with using and carrying the Ruger during and in relation to a drug trafficking crime, and aiding and abetting the same under 18 U.S.C. § 2. Though evidence during the sentencing hearing did not establish that the Ruger was discharged during the course of the drug trafficking crime, the district court sentenced Thompson to the 10-year mandatory minimum under § 924(c)(1)(A)(iii) based on evidence that Jones had discharged the Glock.

We recognize that, as a general matter, Thompson may indeed be held liable for Jones' conduct. As the Government points out, aiding and abetting liability is available under 18 U.S.C. § 2 and *Pinkerton* liability is available for co-conspirators. Nevertheless, the question here is not whether Thompson may be held liable for Jones' actions generally, but rather whether, under the specific language of § 924(c) and the indictment, the district court appropriately sentenced Thompson to the 10-year mandatory minimum.

There are two fundamental problems with the district court's sentence. First, by the terms of the indictment, the grand jury charged Thompson with using and carrying "a Ruger" in connection with drug trafficking, and aiding and abetting the same under 18 U.S.C. § 2. Under a plain reading of the indictment, the Ruger, being "a firearm" for purposes of § 924(c)(1)(A), would be "the firearm" for purposes of Thompson's sentence. Second, the indictment charged Thompson not only with respect to a particular make and model of firearm, it also charged him with respect to specific criminal activity—"us[ing] and carr[ying]" a firearm. In contrast, it charged his

co-defendant with "us[ing], carr[ying], and discharg[ing]" a firearm. Thus, the indictment not only failed to provide Thompson notice that the Glock could serve as "the firearm" for purposes of the § 924(c)(1)(A) enhancements, it also failed to put him on notice that he could be held responsible for the discharge of a firearm.[2]

Had the grand jury expressly incorporated Count 3 into Count 4, then Thompson would have had clear notice that by pleading guilty to Count 4, including the reference to the aiding and abetting statute, he was also potentially liable for the actions of his co-defendant spelled out in Count 3. Alternatively, the grand jury could have dispensed with listing any of the sentencing factors of 18 U.S.C. § 924(c)(1)(A)(i)-(iii) in either Count 3 or 4—i.e., it could have omitted any references to the particular make and model of firearm or the term "discharge" in Count 3, and simply referred to § 924(c)(1)(A) in both counts. *See Almendarez-Torres v. United States*, 523 U.S. 224, 228 (1998) ("An indictment must set forth each element of the crime that it charges. But it need not set forth factors relevant only to the sentencing of an offender found guilty of the charged crime."); *United States v. Perez-Olalde*, 328 F.3d 222, 224 (6th Cir. 2003) (explaining that sentencing factors need not be included in the grand-jury indictment); *Buckley v. Butler*, 825 F.2d 895, 903 (5th Cir. 1987) ("[T]here is no Fifth Amendment right to grand jury indictment on the sentencing facts.").

Instead, by charging Jones specifically with using, carrying and discharging a Glock and charging Thompson only with using and carrying a Ruger, the grand jury narrowed the indictment vis-à-vis Thompson in a material way. *Cf. United States v. Leichtnam*, 948 F.2d 370, 379–81 (7th Cir. 1991) (holding that the Government's decision to limit indictment to a particular weapon constituted a material narrowing of indictment); *see also United States v. Bishop*, 469 F.3d 896, 901–04 (10th Cir. 2006) (same). Because the indictment did not give Thompson fair notice that he could be held responsible for discharge of the Glock, the district court impermissibly exceeded the scope of the indictment at the sentencing stage. Accordingly, we reverse and vacate Thompson's ten-year mandatory minimum sentence under 18 U.S.C. § 924(c)(1)(A)(iii).

We note for clarification that our holding today does not limit the district court on remand to consider only whether Thompson should receive a mandatory minimum of five years under § 924(c)(1)(A)(i). Subparagraph (ii) of that section provides a seven-year mandatory minimum sentence for "brandishing" a firearm. Neither Count 3 nor Count 4 specifically reference brandishing or subparagraph (ii). As the grand jury did not narrow the indictment with respect to brandishing as it did with respect to discharging, the district court is free to consider whether Thompson should receive a sentence for brandishing the Ruger.

### III

Finally, we briefly respond to a few of the dissent's comments. The dissent proposes a "Golden Mean" to guide sentencing courts based in part on the principle that all judicial factfinding must be eschewed unless either the factfinding results in a sentence somewhere within the initial base-offense level under the Guidelines or the district court explicitly explains why the concepts of general and individual deterrence outweigh the mitigating circumstances and the likelihood of

---

[2]In *United States v. Robison*, this court held that "the specific type of firearm used or possessed by the conspirator is not an essential element of the crime." 904 F.2d 365, 369 (6th Cir. 1990). The Ninth Circuit has similarly held that language in an indictment describing the model of a firearm is mere "surplusage, rather than an essential element of the crimes for which [the defendant] was charged." *United States v. Hartz*, 458 F.3d 1011, 1021 (9th Cir. 2006). As the Supreme Court has explained, "The insertion of surplus words in the indictment does not change the nature of the offense charged." *Bridges v. United States*, 346 U.S. 209, 223 (1953). *Robison* and *Hartz*, however, involved claims of constructive amendment; in the instant case, Thompson pleaded guilty to the § 924(c) charge and, consequently, whether he was convicted of an offense other than that charged in the indictment is not at issue. Moreover, the indictment here not only charged Thompson and his co-defendant in relation to different firearms, but, importantly, different criminal activity.

successful rehabilitation. Dis. op. at 14. In order to adopt this Golden Mean, however, courts would first have to don the crowns of philosopher-kings—for that is the only way that any court in this circuit could avoid the clear import, reasoning and holding of binding precedent.

As explained above, both the Supreme Court and this court have consistently treated *adjusted* Guidelines ranges as the applicable ranges for purposes of 18 U.S.C. § 3553(a)(4). *See supra* § II.B.1. Adjustments to the base-offense level routinely depend upon facts found by sentencing judges by a preponderance of the evidence. The Supreme Court has sanctioned judicial factfinding, even factfinding that *enhances* rather than reduces a defendant's sentence, so long as the factfinding does not result in a sentence beyond the statutory maximum. *See supra* § II.B.1. Had the Supreme Court meant, instead, that the applicable Guidelines range really should be the base-offense level, unadjusted by any judicial factfinding, one would have expected that it would have clarified and expounded upon such a seismic shift in how the Guidelines are calculated.[3] In fact, if the dissent's position were sound, one wonders why the Supreme Court did not excise much of the Guidelines when it excised portions of 18 U.S.C. § 3553 and § 3742 in *Booker*.

The dissent's position also conflicts with the underlying theory of the Supreme Court's recent *Rita* decision. The theory of *Rita* is that the Guidelines do take the sentencing factors of § 3553 into account, and when the district court independently takes those factors into account, and reaches a consistent result, a court of appeals may presume that the district court has properly weighed the sentencing factors. *See Rita*, 127 S. Ct. at 2463. The theory only makes sense if the Guidelines are applied as they were contemplated to apply—by taking into account enhancements provided for by the Guidelines. There is simply no basis to contend that the Sentencing Commission ever contemplated sentencing without taking into account enhancements provided for by the Guidelines.

As to the couple of points that the dissent makes about this particular case, the dissent's analysis rings hollow. Leaving aside whether engaging in a conspiracy to distribute five or more kilograms of cocaine is a "victimless" crime, Dis. op. at 12, part of Thompson's sentence was based on his being a felon in possession of a firearm and using and carrying the firearm during the drug transaction. As the district court found based on police testimony and video surveillance, Thompson's "use" of the firearm included pointing it at the CI and the undercover police officer. Thompson's illegal activities were hardly "victimless."

Finally, the district court did not engage in a "rote sentencing" of Thompson, the dissent's characterization to the contrary notwithstanding. Dis. op. at 17. The district court held a sentencing hearing for Thompson and one of his co-defendants. The court heard testimony from three eye witnesses. The transcript of the hearing runs over 100 pages. A review of the transcript confirms that the district court addressed each of Thompson's objections. It also confirms that the court considered the relevant sentencing factors and provided a reasoned explanation for the sentence. Accordingly, apart from the district court's error in exceeding the indictment on the § 924(c)(1)(A) charge, we find no other abuse of discretion in its sentencing of Thompson.

---

[3] In fact, it is unclear whether the dissent's approach would apply to all adjustments to a defendant's base-offense level or just enhancements but not reductions. On the one hand, logic would suggest that the base-offense level is just that—no adjustments, period. This approach would put in jeopardy, among other things, all reductions for acceptance of responsibility and cooperation, neither of which are ever submitted to the jury and which collectively have to be among the most frequently applied adjustments of all. On the other hand, the Sixth Amendment protects a criminal defendant, not the Government, so presumably the dissent's approach would permit reductions to the base-offense level based on judicial factfinding, although one might expect that the Government would be far more inclined to oppose vigorously all reductions if enhancements were off the table. If the latter approach is the one proposed by the dissent, then "seismic shift" likely understates the impact it would have on federal sentencing.

**IV**

Accordingly, for the reasons set forth above, we AFFIRM IN PART and REVERSE IN PART Thompson's sentence.  We REMAND the case to the district court for the limited purpose of resentencing under 18 U.S.C. § 924(c)(1)(A) consistent with this opinion.

———————————

## DISSENT

———————————

MERRITT, Circuit Judge, dissenting.  Except for those judges and lawyers who prefer to continue routine conformity to the old pre-*Blakely-Booker* process of guideline sentencing, there is widespread disapproval of the present muddled system.  This is because, in the main, the old system is just continuing on as though nothing had happened — continuing under the pretext that the guidelines are only "advisory" instead of being considered only as a starting point against the backdrop of the more sensible and humane penalogical goals set out in § 3553(a), Title 18.  This case is one more example of the continuing problem, the problem of guidelineism, or "guidelinitis," the inability of most federal courts to break their habit of mechanically relying just on the guidelines alone.

Here we have a young, drug-addicted, black man dealing in cocaine.  Born illegitimate in Nashville without a father figure, he was abandoned as a child and sent to Tennessee Preparatory School, a school for orphans, juvenile delinquents and other problem children.  Tests showed some mental retardation as a child.  He is now a sad case, with two small children of his own to support and a virtual lifetime in prison.  By ratcheting up the sentence, as is typical under the guidelines, piling aggravator on aggravator, the District Court, in lock-step with the Nashville, Tennessee, U.S. Probation Office recommendations (as though *Booker* had never been decided), went from a base offense level of 32 with 10 criminal history points (corresponding to defendant's guilty plea), carrying a penalty of 15 years, 8 months, to a sentence of 40 years — forty years in prison for a victimless drug crime.  The District Court even made findings of fact not admitted by the defendant that triggered an additional mandatory minimum consecutive sentence of 10 years on top of all the other judicial findings of enhancements not admitted by the defendant.  Most of the 40-year sentence imposed by the court was based on facts never admitted by the defendant or found by a jury.

Such harsh sentences are par for the course under the guidelines.  The sentencing court imposed a harsh sentence without seriously considering mitigating family and personal factors or rehabilitation possibilities — all in line with the U.S. Sentencing Commission rules against the consideration of such individual factors in Chapters 5H and 5K of the Guidelines.[1]  This refusal to seriously consider individual factors, including rehabilitation, has been the most important characteristic of the work of the Sentencing Commission.  From the beginning, the guidelines have emphasized collectives, not individuals; and individualized sentencing by federal judges, the weighing of aggravators and mitigators through a process of dialectic reflection and reconciliation, has become a relic of the past.  The creation of these guidelines involved the breakdown of behavior into smaller and smaller parts and categories of aggravators or enhancements without consideration of other important individual factors.

———————————

[1]The Commission's "not relevant" rule against consideration of a host of mitigating factors such as age, physical condition, education, employment, military, public service, good works, disadvantaged upbringing, addiction, mental illness, family ties, and rehabilitation possibilities are directly contrary to the Supreme Court's interpretation of the Eighth Amendment in *Lockett v. Ohio*, 438 U.S. 586 (1978), and *Eddings v. Oklahoma*, 455 U.S. 104 (1982), requiring states in sentencing to consider such mitigating factors.  The Sentencing Commission, and now the federal courts at its direction, refuse to take into account the mitigating and humanizing factors that *Lockett* and *Eddings* require. There is no indication that any such factors were considered or influenced the sentence in this case.

The ratcheting-up process in the instant case was all based upon judicial findings of fact.[2] It is obvious to anyone who has watched this disingenuous process develop that the present system is completely inconsistent with the *Blakely* and *Booker* opinions, which confine judicial fact finding to those facts carrying out a jury verdict or plea of guilty. As the Court said in *Cunningham*, "under the Sixth Amendment, any fact that *exposes* a defendant to a greater *potential* sentence must be found by a jury, not a judge." *Cunningham v. California*, 127 S. Ct. 856, 863-64 (2007) (emphasis added). This statement of the Sixth Amendment rule was first stated in *Blakely* even more clearly and then repeated in *Booker* and *Rita*. It is still unclear, however, whether the Supreme Court is going to stay with or erode and then reject the clear holding of *Blakely*:

> [T]he '*statutory maximum' for Apprendi purposes* is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*. In other words, the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without any additional findings*. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts 'which the law makes essential to the punishment,' and the judge exceeds his proper authority.

*Blakely v. Washington*, 542 U.S. 296, 303-04 (2005) (emphasis added). What is clear is that the district courts and the courts of appeals, as the majority in this case expressly acknowledges, are not applying this rule and do not believe the Supreme Court actually intends to enforce it. The view seems to be that the remedial opinion in *Booker* is inconsistent with this rule, and so the rule may be simply disregarded in practice.[3] Justice Scalia predicted such a result in *Booker*, noting that the Court's remedial scheme risked preserving "*de facto* mandatory guidelines by discouraging district courts from sentencing outside Guidelines ranges." *United States v. Booker*, 543 U.S. 220, 313 (2005) (Scalia, J., dissenting). Indeed, this *de facto*, mandatory application of the guidelines runs afoul of the Supreme Court's admonition that "*Booker*'s remedy for the Federal Guidelines . . . is not a recipe for rendering our Sixth Amendment case law toothless." *Cunningham v. California*, 127 S. Ct. 856, 870 (2007). Many of the members of the Supreme Court have recognized in

---

[2]It is significant that in the recent cases, *Rita v. United States*, 127 S. Ct. 2456 (2007), *Gall v. United States*, 2007 U.S. LEXIS 13083 (Dec. 10, 2007), and *Kimbrough v. United States*, 2007 U.S. LEXIS 13082 (Dec. 10, 2007), in which the Supreme Court upheld the district court sentences, *the sentence was within or below the guideline range corresponding to the jury verdict or guilty plea*. There was no ratcheting up of the sentence by enhancements outside of the initial sentencing range. There were no judicial fact findings that raised the sentence, and there is no Supreme Court case that allows a court to use guideline enhancements to raise a sentence above the guideline range corresponding to the jury verdict or plea. So when the Supreme Court uses the phrase "within the guidelines," as it does frequently in these cases, it is not yet clear what precisely it means or that it means enhanced sentences based on findings of facts by the judge over and above the facts found by the jury verdict or the guilty plea.

The Supreme Court did not say in *Gall* or *Rita* that the sentencing judge should "start" the sentencing process by enhancing the sentence aggravator by aggravator, as happened in the instant case. The Court said that the sentencing judge should begin with the "applicable Guidelines range" which in *Gall* was the initial base offense level corresponding to facts admitted by the guilty plea, which carried a range of 30 to 37 months. There is no language in *Gall* or *Rita* that requires appellate or district judges to "begin" with the enhancement process. That process is directly contrary to the language quoted below in *Blakely* that a "judge exceeds his proper authority" by basing a higher sentence on judicial findings outside the jury verdict.

[3]The empirical data on this point are clear. From 1990-2003, 90.6% of offenders received sentences adhering to the Guidelines range. In 2006, after *Booker* purportedly made the Guidelines "advisory," 86.3% of offenders still received sentences in the Guidelines range, a range including judicial enhancements. Furthermore, appellate review of these within-Guidelines sentences has not changed post-*Booker*, as circuit courts have affirmed 99.9% of within-Guidelines sentences. Conversely, Circuit courts reversed below Guidelines sentences almost 85% of the time, while only reversing above-Guidelines sentences in less than 5% of the cases. *See* James Bilsborrow, Note, *Sentencing Acquitted Conduct to the Post-Booker Dustbin*, 49 WM. & MARY L. REV. 289, 314-15 (2007).

opinions at one time or another the unprincipled, inconsistent nature of the sentencing game in which we are now engaged.[4]

The only way to begin to return the process to something consistent with the Sixth Amendment and with the concept of individualized sentencing is to recognize and insist that we stick with two overriding principles: *First*, that judicial fact finding and the length of a sentence be limited somewhere within the base-offense-level, guideline range corresponding to the jury verdict or the plea, unless the sentencing judge explains why the concepts of general and individual deterrence should require a longer sentence for the particular individual and outweigh the mitigating circumstances of the case (including factors like age, addiction, and family responsibility deemed irrelevant by the Sentencing Commission in Chapters 5H and 5K), as well as the likelihood of successful rehabilitation. *Second*, that the sentencing judge explain the weighing process outlined above (taking into account moral culpability, general and special deterrence, mitigating circumstances and rehabilitation) so that the sentence and its explanation comply with the "overarching provision instructing district courts to 'impose a sentence . . . not greater than necessary' to accomplish the goals of sentencing," *Kimbrough v. United States*, 2007 U.S. LEXIS 13082, at \*30 (Dec. 10, 2007) (quoting 18 U.S.C. § 3553(a)). This "overarching provision," enacted by Congress in § 3553(a), sets a humane, balancing standard that the sentencing judge should keep as the Golden Mean governing the judicial reflection necessary in each sentencing case to reconcile contrary factors and arguments in the weighing process in order to arrive at a fair sentence.

If judges or lawyers have any doubt about the limitation on judicial fact finding that the *Blakely-Booker-Cunningham* line of cases imposes on sentencing judges and the courts of appeals, they should carefully reread the *Cunningham* case decided a year ago. Six justices joined in the opinion. The opinion opens by stating the question:

> The question presented is whether the DSL [the California determinate sentencing law], by placing sentence-elevating fact finding within the judge's province, violated the defendant's right to trial by jury safeguarded by the Sixth and Fourteenth Amendments. We hold that it does.

*Cunningham v. California*, 127 S. Ct. 856, 860 (2007). After stating the fact that the sentencing judge ratcheted up the defendant's sentence by one level based on judicial fact finding, the court began its analysis of the question in Section II, as follows:

> This court has repeatedly held that, under the Sixth Amendment, any fact that exposes a defendant to a greater potential sentence must be found by a jury, not a judge, and established beyond a reasonable doubt, not merely by a preponderance of the evidence.

*Id*. at 863. The court then finds the basis for its decision in the *Blakely* precedent, quoted above, decided two years before:

> The judge could not have sentenced Blakely above the standard range without finding the additional fact of deliberate cruelty. Consequently, that fact was subject to the Sixth Amendment's jury trial guarantee. 542 U.S. at 304-314, 124 S. Ct. 2531.

---

[4]See, for example, the separate opinions of Justice Stevens ("I am not blind to the fact" that "many federal judges continue to treat the Guidelines as virtually mandatory"); Justices Scalia and Thomas, ("no one knows — and perhaps no one is meant to know — how advisory Guidelines . . . will function in practice"); Justice Souter ("consistency began to falter," the "gravitational pull to now-discretionary Guidelines . . . preserve the very feature . . . that threaten to trivialize the jury right" so that it is "fair to ask just what has been accomplished"). *See Rita*, 127 S. Ct. 2456, 2474, 2475, 2487-88.

It did not matter, we explained, that Blakely's sentence, though outside the standard range, was within the 10-year maximum for class B felonies:

> "Our precedents make clear . . . that the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant* . . . . In other words, the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts 'which the law makes essential to the punishment,' . . . and the judge exceeds his proper authority." *Id*. at 303, 124 S. Ct. 2531 (emphasis in original) (Quoting 1 J. Bishop, Criminal Procedure § 87, p. 55 (2d. ed. 1872)).

*Id.* at 865. The court emphasized, reemphasized and then stated again that ratcheting up sentences through judicial fact finding violates the Sixth Amendment:

> If the jury's verdict alone does not authorize the sentence, if, instead, the judge must find an additional fact to impose the longer term, the Sixth Amendment requirement is not satisfied.

*Id*. at 869. Finally, the court makes it clear that Justice Breyer's remedial opinion in *Booker* in no way alters the rule against ratcheting up the sentence by judicial, factual findings of enhancements:

> *Booker's* remedy for the federal guidelines, in short, is not a recipe for rendering our Sixth Amendment case law toothless. [Footnote 15] Justice Alito, however, would do just that. His opinion reads the remedial portion of the Court's opinion in *Booker* to override *Blakely*, and to render academic the entire first part of *Booker* itself.

In other words, the sentencing judge should start with the base offense level corresponding to the facts found by the jury verdict or admitted by the guilty plea. The sentencing judge should not go up or down from that point unless in his or her own mind the weighing process of the two overriding principles stated above requires it. The judge should not engage in guidelineism, adjusting the sentence up or down just because the guidelines say so, as occurred in the instant case, but rather because the judge's own sense of justice, upon reflection, leads to a different result than the beginning, base-offense level. This allows the guidelines to play a pivotal role to begin with but requires the judge to use his or her own mental faculties and best judgment, just as judges did in the days of indeterminate sentencing before the mandatory federal sentencing guideline era.

The job of the Court of Appeals should be only to see that the federal sentencing judge (1) starts at the right place in the reasoning process (at the base offense level corresponding to the jury verdict or guilty plea), as required by the Sixth Amendment as interpreted by *Blakely*, *Booker*, and *Cunningham*, and (2) engages in a general process of serious dialectical reflection and reconciliation, as evidenced by the reasons given for deviating from the starting point established under Sixth Amendment constraints. This process should put an end to the rote, ratcheting-up process that now characterizes the sentencing process, a process based on the Commission's rule that mitigating factors are "not relevant."

This modified system based on these two principles is, more or less, what the system would have looked like in the beginning if the Guidelines were truly "guidelines" rather than mandatory rules. If the Commission, in the beginning, as many judges and lawyers recommended, had adopted guidelines to assist judges rather than to discipline and correct judges this modified system would

have perhaps provided a workable system. I myself testified before the Commission advising it not to saddle the judiciary with mandatory rules that are constitutionally suspect because such rules would most likely eliminate individualized sentencing and full consideration of mitigating factors. The Commission, however, believed that federal judges could not be trusted to exercise discretion properly and that harsher sentencing rules must be imposed on judges in order to insure longer sentences and collective uniformity. The current Guidelines that ratchet up sentences without considering mitigating factors or rehabilitation are the result.

The modified system described above is a different process of sentencing from either pure indeterminate sentencing, as it operated before the guidelines, or the mandatory, rote guideline process that prevailed before the Sixth Amendment was recognized as a limitation on fact finding. Hopefully, such a modified system would begin to provide a balance between the collectivized, sentencing process of lock-step, upward adjustments heretofore required by the Commission, and the thoughtful individual sentencing by federal judges that was the ideal behind the federal sentencing system used so effectively (in my opinion) for 200 years since the first Congress enacted the first sentencing law, 1 Stat. 112, ch. 9 (1790).[5] Further, a system that incorporates facets of indeterminate sentencing preserves the historical role of judges as sentencing experts and the jury as fact finder. Sentencing procedures based on these roles were never challenged as undermining the Sixth Amendment's right to a jury trial because judges did not function as objective fact finders and judge-found facts did not carry determinate consequences.

Such a modified system includes an element of democratic, legislative control over sentencing while keeping elements of individualized sentencing from the old system. Such a modified system may be strongly resisted by prosecutors and the Department of Justice officials who have now become accustomed to controlling sentencing through the charging process, the release of enhancement information to probation officers and plea bargaining. Back in my day as U.S. Attorney 40 years ago, prosecutors were viewed solely as parties to the case and not entitled to control the length of the sentence. Removing control of sentencing from the prosecutorial arm of the government should be viewed as a step forward, although it is really a step back in history to restore the benefits of individualized sentencing practiced by English and American judges since the beginning of the 18th Century.

The modified scheme proposed above squares with the most recent Supreme Court decision, *Gall v. United States*, No. 06-7949, 2007 U.S. LEXIS 13083, at *21 (December 10, 2007), in which the Court instructed district court judges to "make an individualized assessment based on the facts presented" with the Guidelines operating as the "initial benchmark" but "not the only consideration." In *Gall,* the Supreme Court affirmed the district court's sentence of thirty-six months probation, a punishment based upon the district judge's individualized evaluation of the factors under 18 U.S.C. § 3553(a) — particularly rehabilitation — and rejected the appellate court's rote application of the Guidelines. Moreover, this approach lessens the likelihood of as-applied Sixth Amendment challenges, which, as Justice Scalia points out, are still available. *Id.* at *39 (Scalia, J., concurring).

Unfortunately, the sentencing process in this case was just a repeat of guidelinitis, the system of rote sentencing in which the sentencing judge ratchets up the sentence instead of engaging in

---

[5]The system of jury fact finding and individualized sentencing by judges enacted by the First Congress was the system developed to reconcile justice with mercy by our judicial forebearers as the English system of criminal law — developed particularly after the demise of the prerogative courts of Star Chamber and High Commission following the English civil war, the Glorious revolution of 1688, the English Bill of Rights of 1689, and the creation of an independent judiciary in the Judges' Bills of 1692 and 1701. *See* Harold J. Berman, *Law and Revolution II, The Impact of the Protestant Reformation on the Western Legal Tradition*, 226-28, 306-29 (Harvard Univ. Press 2003); Blackstone, *Commentaries on the Laws of England, Book IV*, Chap. 29, 368-82 (Legal Classics Library Ed. 1983). The Sentencing Guidelines removed individualized sentencing by judges that had existed in Anglo-American law for more than three centuries.

anything close to the deliberative or reflective process outlined by the two overriding principles stated above.  The determinate sentence based on judicial fact finding, including a consecutive mandatory sentence based entirely on facts never found by the jury or admitted, makes the principle of *Blakely*, *Booker*, and *Cunningham* a joke.  Hence, I would reverse and remand the case for resentencing from the beginning in compliance with the two overriding principles stated above.  The sentencing court should start with the guideline sentence corresponding to the guilty plea, take a look at how the guidelines would operate from that point and then engage in the weighing and explanatory process outlined above without feeling an obligation to reach a result consistent with the Commission's guideline structure or policies.  After finding the beginning guideline sentence, it is up to the judge to act like a common law judge of old engaged in the same process that prevailed in the federal system after 1790 but before the failed, 20-year experiment in mandatory guideline sentencing.